COMMONWEALTH vs. KEVIN FRANCIS.

Suffolk.   December 6, 1983. — March 7, 1984.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Practice, Criminal,* Argument by prosecutor, Capital case. *Evidence,* Photograph.

A technically inaccurate statement of evidence made by the prosecutor in his closing argument at the trial of a murder case did not, in the circumstances, constitute prejudicial error.   [371-374]

In the circumstances of a murder trial, in which the identifying witness testified to having had his closest view of the victim's pursuer in profile as that person passed within fifteen feet of him, the judge did not err in denying the defendant's request that either the double-pose ("mugshot") photographs in the array of photographs from which the witness had identified the defendant be excluded entirely or that the profile views be severed.   [374-375]

INDICTMENT found and returned in the Superior Court Department on December 17, 1981.

The case was tried before *Travers, J.*

*Stephen Hrones* for the defendant.

*Judy G. Zeprun,* Assistant District Attorney, for the Commonwealth.

LYNCH, J.   The defendant was convicted of murder in the first degree.   He is now appealing, pursuant to G. L. c. 278, § 33E, contending that:   (1) the prosecutor misstated certain evidence during his closing argument to the jury and this misstatement was sufficiently prejudicial to require reversal;   (2) the judge's admission in evidence of combined frontal and profile photographs (commonly termed "mugshots") which an eyewitness had used to identify the defendant improperly suggested to the jury that the defendant had engaged in prior criminal activity; and (3) these errors considered individually or together amounted

to a miscarriage of justice. G. L. c. 278, § 33E. Finding no error by the prosecutor or the judge on the points alleged, and no reason to exercise our power under G. L. c. 278, § 33E, we affirm.

We summarize the relevant facts. On September 19, 1981, at approximately 7:00 P.M., Terrence Smith, the eyewitness, was driving along Blue Hill Avenue toward Mattapan Square, in Boston. It was drizzling slightly, but was starting to clear, and Smith was able to see by natural light. He saw a young woman on the sidewalk running toward him. Although his vehicle was moving at approximately fifteen to twenty miles per hour, he observed that the woman was carrying a stick and that she was wearing a "rain or shine" jacket, new boots, and dungarees. Smith then saw a man running about forty or fifty yards behind the woman. As the man drew closer, Smith noticed a knife in his hand. Upon observing this, he slowed down his car. Although there is some dispute over his precise actions at this point, Smith either stopped and opened the door of his automobile, placing one foot on the ground, or he slowed down to better observe the scene in front of him. The man then passed Smith, and continued to run along the sidewalk after the woman. At trial, Smith testified that the man came within fifteen feet of him, such that it was possible to get "a very good side view." Over-all, Smith observed the man for a total of eight to ten seconds.

About 7:15 P.M. that evening the police received a call summoning them to the Franklin Field area, and upon arrival they discovered the body of the victim, Vanessa Marson. At trial, the medical examiner testified that the victim had died of multiple stab wounds to her chest and skull.

On September 30, 1981, from an array of ten or twelve photographs submitted to him by the police, Smith initially identified the defendant as being the man he observed on the evening in question. The next day, he identified (by means of a photograph) Vanessa Marson as "the girl that was running up the street." At trial, Smith again identified the defendant as the man he saw running along Blue Hill Avenue

with a knife.  The defendant was a former boyfriend of the victim, and the prosecution introduced evidence that he had threatened the victim (who was since dating someone else) two months before the murder occurred.[1]

The defendant alleges that the prosecutor misstated the testimony of a defense witness, James Stuckey, whose testimony was introduced to cast doubt on Smith's credibility as an eyewitness.  Stuckey, who was a friend of Smith, testified that Smith and others were visiting him on September 20, 1981, the day after Smith had witnessed the events on Blue Hill Avenue.  During this visit, Stuckey received a telephone call from his daughter.  When he rejoined his guests, he told them that his daughter's girl friend had been killed on Blue Hill Avenue.  Smith then recounted his observations of the prior evening.

In Smith's various recollections of the incident, both during his initial interview by police and at trial, he maintained consistently that after seeing the pursuer's knife he stopped his car and placed one foot on the ground outside the vehicle to gain a view unrestricted by the interior of the car.  He also stated that upon hearing about the murder from Stuckey he related the same set of events.  Stuckey, however, after repeated questioning at trial, stated that Smith had told him that he only slowed down, but did not stop, his car.[2]

---

[1] The victim's cousin testified that while she was accompanying the victim to a concert in July, 1981, they came unexpectedly upon the defendant, who said to the victim, "I see you.  You cannot hide from me.  I'm going to get you."  The prosecution also introduced evidence that, after the victim had ended her relationship with the defendant, on repeated occasions he made telephone calls of a harassing nature to the victim's residence.

[2] The pattern of questioning was as follows:

DEFENSE COUNSEL:  "Did he indicate whether or not he stopped his car?"

THE WITNESS:  "He said he slowed down a little and he just kept on going because he said he thought, maybe, the young man and lady were just playing."

. . . .

During his closing argument, the prosecutor stated that "[h]e [Smith] never said whether he stopped or didn't stop [to Stuckey]. He didn't give a complete statement to Mr. Stuckey. . . . They never got to the issue whether he stopped or not." The defendant's objections to these statements were overruled. Although he did not request the judge to issue curative instructions to the jury at the time, he now contends that this portion of the prosecutor's argument was improper, that specific instructions were required to ameliorate the harm, and that in their absence prejudicial error resulted.

The proper scope of a prosecutor's closing argument may be simply summarized: counsel may argue as to the evidence and any inferences that may be drawn from it. *Commonwealth* v. *Earltop*, 372 Mass. 199, 205 (1977) (Hennessey, C.J., concurring). *Leone* v. *Doran*, 363 Mass. 1, 18 (1973). "Counsel has the right to argue inferences from the evidence favorable to his case, and the precise form should not control unless it tends to lead the jury to an improper inference not from the evidence but from the apparent personal knowledge of the attorney." *Commonwealth* v. *Nordstrom*, 364 Mass. 310, 315 (1973).

There was an apparent inconsistency between Smith's recollection of his reaction to viewing the defendant's pursuit of the victim and Stuckey's acount of Smith's description of the incident the next day. Although the prosecutor's closing argument offered a doubtful interpretation of the testimony, this version was, at least, within the reasonable inferences permissibly open to conjecture from the testi-

---

DEFENSE COUNSEL: "He told you that's the reason he just slowed down?"

THE WITNESS: "Yeah."

DEFENSE COUNSEL: And he said he didn't stop?"

THE WITNESS: "No, he didn't stop."

DEFENSE COUNSEL: "He said he didn't get out of his car?"

THE WITNESS: "Right, he didn't get out of his car."

DEFENSE COUNSEL: "You are sure he said that he thought they were just fooling around?"

THE WITNESS: "Yes."

mony in its light most favorable to the Commonwealth. Smith remained adamant that he in fact stopped his car upon observing the defendant pursuing the victim. It was open to the prosecutor to argue that the difference between Smith's and Stuckey's testimony was the result of an incomplete discussion of the event or a misinterpretation by Stuckey of Smith's account. The particular statement of the prosecutor to which the defendant objected occurred while the prosecutor was attempting to articulate this concept of an incomplete discussion. The statement by the prosecutor that Smith "never said whether he stopped or didn't stop," although technically inaccurate in the narrowest sense, cannot be characterized as an intentional misstatement sufficient to constitute reversible error, especially when the evidence is considered in the context of his argument as a whole.

Even if we were to find that the prosecutor's characterization of the evidence was intentionally misleading, the defendant has failed to show that it had a sufficiently prejudicial effect on the jury to merit reversal. The truly critical element of Smith's testimony was not contested by Stuckey: the latter corroborated Smith's statement that he was able to get a good view of the victim's pursuer. This went to the heart of Smith's role as an eyewitness. When we consider the prosecutor's argument as a whole, as we must, *Commonwealth* v. *DeChristoforo*, 360 Mass. 531, 537 (1971), aff'd sub nom. *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 645 (1974), the defendant has failed to demonstrate that this characterization by the prosecutor prejudiced the jury. This is not a case where the prosecutor made reference to a defendant's failure to testify, *Commonwealth* v. *Gouveia*, 371 Mass. 566, 570-572 (1976), or stated his personal belief in the defendant's guilt, *Commonwealth* v. *Sherman*, 294 Mass. 379, 390-391 (1936), or attempted to use ethnic prejudice to sway the jury, *Commonwealth* v. *Graziano*, 368 Mass. 325, 331-332 (1975).

In addition, the jury's deliberative processes were further shielded from any possible prejudice because of several

statements by the prosecutor and the judge. Both at the commencement of his closing argument *and* immediately before he uttered the alleged misstatement, the prosecutor cautioned the jury that "it is your recollection that controls and not mine." In his instructions to the jury, the judge also informed them at the outset that it was their "collective memory of what the evidence is that count[ed]," not counsel's. These statements by the prosecutor and the judge further insulated the jury from any prejudice that could arise from taking the prosecutor's remarks too literally. See *Commonwealth* v. *Burnett*, 371 Mass. 13, 19 (1976); *Commonwealth* v. *Coleman*, 366 Mass. 705, 713-714 (1975); *Commonwealth* v. *Stone*, 366 Mass. 506, 515 (1974).

The defendant makes a second argument, that it was improper for the judge to admit in evidence frontal and profile view photographs of the defendant and others which made up the array from which the eyewitness Smith made his initial identification. The judge denied the defendant's request that either the photographs be excluded entirely or that the profile views be severed. While acknowledging the prejudicial impact if the jury were to infer from the submission of the photographs that the defendant had a prior criminal record, the judge ruled that the "sanitizing" measures undertaken by the prosecution and defense to disguise the source of the photographs were sufficient and that the photographs' critical role as a piece of evidence compelled their admission. We can find no reason to reverse the judge's ruling.

We discussed the risks inherent in admitting photographs of the "mugshot" variety in our recent decisions in *Commonwealth* v. *Blaney*, 387 Mass. 628, 638 (1982), and *Commonwealth* v. *Weichell*, 390 Mass. 62, 76 (1983). In these decisions, we enunciated the basic requirement that judges and prosecutors should "use reasonable means to avoid calling the jury's attention to the source of the photographs used to identify the defendant." *Commonwealth* v. *Blaney*, *supra* at 638. Although exclusion or severance of the photographs may be called for in certain circumstances, we left the question whether an appropriate cropping or pasting up

of the photographs might serve the same purposes to the discretion of the trial judge. *Commonwealth* v. *Weichell, supra* at 76. Specifically, where such photographic evidence is particularly probative and the risk of prejudice is slight, we did not want to foreclose the judge from authorizing its admission.

In the instant case, the dual-posed photograph of the defendant served a highly significant evidentiary function. It was from this photograph, when compared with eleven others, that the eyewitness identified the defendant. The defense's case rested primarily on discrediting the ability of Smith to observe the events at issue, a trial strategy that the defense pursued during its extensive cross-examination of him. It was only after this potentially damaging cross-examination, in an attempt to support the credibility of the witness, that the prosecution introduced the photographs. In doing so, the prosecution made no reference to their source before the jury. The photographs were cropped to remove any telltale identification numbers, and their reverse sides were pasted over with blank paper. The inclusion of the profile views was important: the eyewitness had his closest view of the victim's pursuer in profile as that person passed within fifteen feet of him, running along the sidewalk. There was no abuse of discretion in the judge's admission of the dual-posed photographs.

Finally, considering the defendant's contentions and the trial as a whole, the jury's verdict was not "against the weight of the evidence considered in a large or nontechnical sense," *Commonwealth* v. *Bowman,* 373 Mass. 760, 765 (1977), nor did his conviction constitute a miscarriage of justice. Therefore, we decline to invoke our power under G. L. c. 278, § 33E. Our job is not to sit as a second jury passing anew on the defendant's guilt. *Commonwealth* v. *Reddick,* 372 Mass. 460, 464 (1977). The identification by the eyewitness Smith of the defendant as the victim's pursuer, when coupled with the evidence of the defendant's and the victim's prior relationship, its subsequent dissolution, and the threats made by the defendant to the victim

prior to her death, amply supports the jury's conclusion that the defendant was guilty of murder in the first degree.

*Judgment affirmed.*