## COMMONWEALTH *VS.* CLINTON J. MAYNARD.

Franklin. January 11, 2002. - April 25, 2002.

Present: MARSHALL, C.J., SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Homicide. Malice. Proximate Cause. Joint Enterprise. Kidnapping. Practice, Criminal,* Capital case, Admissions and confessions, Argument by prosecutor, Assistance of counsel. *Constitutional Law,* Admissions and confessions, Assistance of counsel.

At the trial of an indictment for murder in the first degree, the Commonwealth's evidence was sufficient to prove beyond a reasonable doubt that the defendant acted with malice aforethought [562-563], that his actions were a proximate cause of the victim's death [563-564], and that he was engaged in an ongoing joint venture with others to inflict brutal and ultimately fatal injuries on the victim over an extended period of time [564-565].

At the trial of an indictment for murder in the first degree, the Commonwealth's evidence provided a sufficient basis on which the jury could permissibly infer that the defendant's own individual acts directly contributed to the victim's death, and that the intervening abuse or beatings of the victim by others was not, in the circumstances, an unforeseeable, independent, intervening cause that would relieve the defendant of his individual culpability. [565-566]

At a criminal trial, evidence that the defendant tied up the victim to facilitate efforts to electrocute him, and otherwise assisted in physically keeping the victim confined so that he could be further abused, was sufficient to support the defendant's conviction of kidnapping on theories of joint and individual liability. [566-568]

At a criminal trial, the judge did not err in admitting in evidence the defendant's confession to the police, based on the judge's finding that the defendant, while being questioned by police, neither requested an attorney nor asked if he should have one present. [568-569]

An isolated misstatement in the prosecutor's closing argument at a criminal trial did not amount to prejudicial error warranting reversal, given the judge's repeated instructions to the jury that arguments of counsel were not evidence, and given the strong weight of evidence presented against the defendant on the issue in question. [569-571]

A criminal defendant failed to demonstrate that his counsel rendered ineffective assistance by failing to object at trial to the of the defendant's statements to the police, where the issue had already been decided in a pretrial hearing on the defendant's motion to suppress [571-572]; or by failing to seek a curative instruction to an isolated and nonprejudicial misstatement in the prosecutor's closing argument [572-573].

INDICTMENTS found and returned in the Superior Court Department on June 16, 1995.

A pretrial motion to suppress evidence was heard by *Richard E. Welch, III,* J., and the cases were tried before him.

*Russell C. Sobelman* for the defendant.

*Judith Ellen Pietras,* Assistant District Attorney, for the Commonwealth.

CORDY, J. In December, 1994, twenty-two year old Billy Paige entered the home of his friend, Fred Perry, in Greenfield. By all accounts, he never walked back out. In May, 1995, his body was found in a flooded quarry in Fitzwilliam, New Hampshire. A Franklin County grand jury subsequently indicted Clinton J. Maynard for murder, kidnapping, and aggravated rape.[1] At the conclusion of the Commonwealth's case, the judge allowed Maynard's motion for a required finding of not guilty on the charge of aggravated rape, but denied similar motions directed to the charges of kidnapping and murder. The defense rested without calling any witnesses and the remaining indictments were submitted to the jury on the Commonwealth's theories of individual and joint venture liability. The jury returned general verdicts finding Maynard guilty of both kidnapping and murder in the first degree by reason of deliberate premeditation and extreme atrocity or cruelty. He was sentenced to a term of life imprisonment on the murder conviction and a concurrent term of from twelve to sixteen years on the kidnapping conviction.

On appeal, Maynard claims that the evidence was insufficient to support his convictions, that his confession should have been suppressed, that the prosecutor committed prejudicial misconduct when he misstated the evidence in his closing argument, and that his counsel was ineffective in failing to renew an objection to the admission of Maynard's confession at trial and in failing to object to the prosecutor's misstatement of the evidence in closing argument. We affirm the convictions and conclude that relief under G. L. c. 278, § 33E, is not warranted.

1. *Facts.*

The jury could have found the following facts based on the

---

[1]Frederick H. Perry was also indicted in Paige's death. After a separate trial, he was convicted of kidnapping and murder in the first degree. We affirmed his convictions. *Commonwealth* v. *Perry,* 432 Mass. 214 (2000) (*Perry*).

Commonwealth's evidence. Billy Paige, known to his friends as "Doughboy," had attended special education classes at a technical high school and had participated in the Special Olympics. In the fall of 1994, he became acquainted with Fred Perry. They traveled to Arizona together, unsuccessfully looking for work, and returned to the Greenfield area in early December. On their return, they initially stayed with a friend of Perry's, Wendy Poirier, in a nearby town, but Poirier asked the two to leave about ten days later because she could not stand to watch Perry physically abuse Paige. Poirier and her fiancé drove Perry and Paige to the Perry family home in Greenfield shortly before Christmas, 1994. Living in the Perry household at that time were Perry's mother, Lena, and his three brothers.

During the period between late December, 1994, and early April, 1995, Paige remained in the house, a virtual prisoner of the Perry family. He was beaten, tortured, mutilated, and starved. Maynard was Fred Perry's cousin. He frequently visited the Perry home and participated in the abuse of Paige. Among other things, there was evidence Maynard tied Paige to a weight bench, attached wires to his body and attempted to electrocute him, beat him about the face and head with a bicycle chain, broke his finger, struck him in the forehead with the blade of a large knife, stabbed him in the elbow, raked keys across his scalp to draw blood, struck Paige repeatedly in the throat with his forearm, dropped him on his head and neck, took turns with the Perry brothers holding and beating him, scrubbed his open wounds with caustic household cleaners, and forced him to drink household cleaners. There was also evidence of other abuse inflicted by the Perry brothers, some in Maynard's presence.

Laura White visited the Perry home regularly between December, 1994, and February, 1995, and observed Paige's injuries on several occasions. In December, 1994, White, who had taken courses toward becoming a licensed practical nurse, observed several burns on Paige's body. He had been burned on his tongue, the side of his face, and on both arms. On a subsequent visit, around December 31, 1994, White observed extensive injuries to Paige that led her to conclude he had been "beaten very severely. . . . His face looked like a pumpkin, it

was purple [and] very very swollen. His jaw was crooked, it looked like his nose was broken, [and] his eyes were . . . swollen shut." White further testified that Paige was bleeding from his nose and ears, he was unable to talk, and "[h]is arm looked like it had been broken."

White visited the Perry house again on February 14, 1995, and observed extensive injuries to Paige. She testified, "If the New Year's beating was bad, the Valentine's day beating was worse. . . . [His] face was very large, it was almost deformed. His ears were bleeding . . . . His nose was all kind of crooked [and] [h]is mouth was all messed up." White testified that she was afraid to tell anyone about the abuse because "they would know it was me, and I would be the one who got it next."

As a result of his multiple injuries, Paige eventually succumbed sometime before April 9, 1995. Maynard was at the Perry home when Paige died, and assisted three of the Perry brothers in disposing of his body. Maynard and the others wrapped the body in a blanket, weighted it down with cinder blocks, barbells, and a vise, drove to Fitzwilliam, New Hampshire, and threw it in a quarry.

2. *Sufficiency of the Evidence on the Murder Charge.*

The Commonwealth requested that the charge of murder in the first degree be submitted to the jury on theories of individual and joint liability. Because the jurors returned a general verdict of guilty, we must review the sufficiency of the evidence under both theories.[2] See *Commonwealth* v. *Perry*, 432 Mass. 214, 221 (2000) (*Perry*), citing *Commonwealth* v. *Flynn*, 420 Mass. 810, 811 (1995). We conclude that the Commonwealth's evidence was sufficient to support the conviction of murder in the first degree on both theories.

The standard we apply is whether, after viewing the evidence in the light most favorable to the Commonwealth, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). "[I]t is not necessary to prove that

---

[2]We note, as we did in *Perry*, *supra* at 221 n.5, that the preferable practice in these circumstances would be to provide a verdict slip requiring the jurors to specify on which theory (or theories) they convict.

no one other than the accused could have performed the act," *Commonwealth* v. *Casale*, 381 Mass. 167, 175 (1980), but "[t]he question of guilt must not be left to conjecture or surmise." *Commonwealth* v. *Anderson*, 396 Mass. 306, 312 (1985).

a. *Malice aforethought*.[3] Under both joint and individual theories of liability, the Commonwealth must prove that the defendant acted with malice aforethought. See *Perry*, *supra* at 221-222, citing *Commonwealth* v. *Semedo*, 422 Mass. 716, 719-720 (1996) (under joint venture theory, "the Commonwealth must show that the defendant shared with the principal the mental state required for the crime of murder . . . malice aforethought"). "Malice aforethought may be shown by proof that the defendant, without justification or excuse, intended to kill the victim." *Commonwealth* v. *Semedo*, *supra* at 720. It may also be inferred from the intentional use of a deadly weapon. *Commonwealth* v. *Albert*, 391 Mass. 853, 860-861 (1984). In this case, Maynard's use of deadly weapons in the beating of Paige, along with his administration of painful and potentially deadly electrical shocks to the victim, supports the reasonable inference that Maynard acted with malice aforethought.[4] See *Perry*, *supra* at 222, citing *Commonwealth* v.

---

[3]While Maynard does not specifically contend on appeal that the Commonwealth's evidence as to malice aforethought and proximate cause (see *infra*) was insufficient to support his murder conviction, we nonetheless examine the sufficiency of the evidence on each of these elements pursuant to our G. L. c. 278, § 33E, review. Our analysis of these elements closely parallels our discussion in codefendant Perry's appeal where much of the evidence and many of the witnesses were the same. See *Perry*, *supra* at 221-225. In that case, however, the issues of malice aforethought and proximate cause were specifically raised by the defendant.

[4]Maynard was convicted of murder in the first degree by reason of premeditation and extreme atrocity or cruelty. In cases of murder by reason of extreme atrocity or cruelty, malice aforethought may also be "inferred if, in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act." *Commonwealth* v. *Semedo*, 422 Mass. 716, 720 (1996). Maynard's acts clearly evinced an intention to inflict injury on Paige and the jury could properly infer that, in the eyes of a reasonably prudent person, there was a plain and strong likelihood that death would follow from his actions. See *Perry*, *supra* at 222; *Commonwealth* v. *Vazquez*, 419 Mass. 350, 353 (1995) (specific intent for crime of murder "could have been established by the defendant's repeated

*Williams*, 428 Mass. 383, 388 (1998), and *Commonwealth* v. *Williams*, 422 Mass. 111, 121 (1996).

b. *Proximate cause.* The Commonwealth must adduce sufficient evidence to support a reasonable inference that the defendant's actions were "a cause, which, in the natural and continuous sequence, produce[d] the death, and without which the death would not have occurred." *Commonwealth* v. *Rhoades*, 379 Mass. 810, 825 (1980), quoting California Jury Instructions, Criminal § 8.55 (4th rev. ed. 1979) (defining proximate cause). According to the medical examiner, Paige died as "the result of multiple blunt and sharp force injuries directed to [his person] over a period of time, and the resultant associated stress." The medical examiner also stated that some of the wounds, if left untreated, could have caused the victim's death. Given the numerous injuries evident on Paige's body and its prolonged immersion in water, the examiner was not able to discern, with any greater specificity, which specific injuries were the direct cause of Paige's death.

The evidence showed that Maynard, along with Perry and others, participated in severely beating Paige on numerous occasions, often by means of dangerous weapons. Maynard himself admitted to such acts as striking Paige in the forehead with a knife, stabbing him in the elbow, and attempting to electrocute him. There was further evidence that Maynard dropped Paige on his head and neck, and that both Maynard and Perry repeatedly struck Paige across the throat and hit him about the face and head with a bicycle chain. These facts warrant the inference that Maynard's actions, as well as those of codefendant Perry, caused "blunt and sharp force injuries" to Paige and that their actions resulted in extreme pain and "stress" on the part of the victim. See *Perry, supra* at 224. Given that the foregoing were cited by the medical examiner as causes of Paige's death, the evidence was sufficient to warrant the inference that Maynard's acts caused that death. See *id.*

It is well established that there may be more than one proximate cause of a victim's death. See *Perry, supra* at 228;

infliction of serious physical injuries"); *Commonwealth* v. *Mahoney*, 406 Mass. 843, 848 (1990) (proposition that "defendants should have known as vicious beating progressed that victim could suffer death").

*Commonwealth* v. *McLeod*, 394 Mass. 727, 745 n.21, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985). "When the conduct of two or more persons contributes concurrently as proximate causes of a death, the conduct of each is a proximate cause of the death regardless of the extent to which each contributes to the death. A cause is concurrent if it was operative at the moment of death and acted with another cause to produce the death." *Id.* Here, the evidence warranted the inference that the effects of Maynard's acts of abuse and violence toward Paige were operative at the time of his death, and a contributing cause thereof. See *Perry*, *supra* at 228.

c. *Joint venture liability.* Where multiple assailants participate in a joint venture to commit murder, "[t]he Commonwealth [is] not required to prove the precise conduct of each [individual] if there [is] evidence that a [homicide] took place." *Perry*, *supra* at 223, quoting *Commonwealth* v. *Bianco*, 388 Mass. 358, 367, *S.C.*, 390 Mass. 254 (1983). See *Commonwealth* v. *Williams*, 422 Mass. 111, 121 (1996), quoting *Commonwealth* v. *Chipman*, 418 Mass. 262, 268 (1994) ("Direct evidence of who shot the victim[] 'is not required where, as here, there is strong circumstantial evidence that one of the [assailants] shot' the victim[]"). Instead, the Commonwealth must prove beyond a reasonable doubt that the defendant was "(1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth* v. *Ortiz*, 424 Mass. 853, 856 (1997), quoting *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988). "Additionally, the Commonwealth must show that the defendant shared with the principal the mental state required for the crime of murder." *Commonwealth* v. *Semedo*, *supra* at 719. "The jury may infer the requisite mental state from the defendant's knowledge of the circumstances and subsequent participation in the offense." *Commonwealth* v. *Cohen*, 412 Mass. 375, 381 (1992), quoting *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). However, "mere presence coupled with the failure to take affirmative steps to prevent the crime is insufficient, as is simple knowledge that a crime will be committed, even if evidence of such knowledge is supple-

mented by evidence of subsequent concealment of the completed crime." *Commonwealth* v. *Ortiz, supra* at 859, citing *Commonwealth* v. *Raposo*, 413 Mass. 182, 185 (1992).[5]

The Commonwealth's evidence was sufficient to show that Maynard was present, knew about, participated in, and rendered aid to the joint venture, and shared the requisite mental state for the crime of murder. See *Perry, supra* at 223; *Commonwealth* v. *Semedo, supra* at 719. The record is replete with evidence that Maynard observed and participated in the repeated physical abuse of Paige, often with the assistance of the Perry brothers. In addition to eyewitness testimony regarding his personal participation in the acts of abuse outlined above, Maynard admitted to police that Paige "either died from the beating or from not eating," and that Paige was unable to eat because "we had messed up his face and mouth."[6] When asked by police who was the worst of the participants in abusing Paige, Maynard confessed, "We were all pretty bad, but I can't really say that there is a worst." These facts supported submission of the case to the jury on the theory that Maynard was engaged in an ongoing joint venture with others to inflict brutal and ultimately fatal injuries on the victim over an extended period of time. See *Perry, supra* at 224.

d. *Individual liability.* Evidence that Maynard himself used deadly weapons, repeatedly participated in brutal beatings administered to Paige, and attempted to electrocute him, along with the medical examiner's testimony as to the cause of death, provided a sufficient evidentiary basis on which the jury could permissibly infer that Maynard's own acts directly contributed to Paige's death. *Perry, supra* at 227, citing *Commonwealth* v.

---

[5]As we held in codefendant Perry's case, "Evidence that the defendant assisted in 'avoiding detection and detention' and 'attempt[ed] actively to conceal evidence' warrants the inference that he continued to be involved in the joint venture." *Perry, supra* at 224, quoting *Commonwealth* v. *Mavredakis*, 430 Mass. 848, 863 (2000). The evidence that Maynard assisted Perry in disposing of the body, while insufficient standing alone, could be considered by the jury as evidence of consciousness of guilt. See *Commonwealth* v. *Conkey*, 430 Mass. 139, 141 (1999); *Commonwealth* v. *Gallison*, 383 Mass. 659, 666 (1981).

[6]The medical examiner testified that Paige's jaw was badly broken. Other witnesses testified that Paige lost approximately one hundred pounds during this period of privation.

*McLeod*, 394 Mass. 727, 745, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985) (where multiple assailants beat victim to death and evidence showed that defendant assaulted victim with deadly weapon so as to put victim's life in jeopardy, defendant's "liability as a contributing cause of [the victim's] death need not be related to any theory of joint liability, nor need [the defendant's] acts have been the sole cause of death").

While Maynard does not specifically raise the issue of intervening acts, we note, as we did in codefendant Perry's appeal, that the intervening abuse or beatings of Paige by other individuals does not serve to relieve Maynard of his individual culpability. See *Perry*, *supra* at 227. "Intervening conduct that is reasonably foreseeable will not relieve the defendant of criminal responsibility." *Id.*, quoting *Commonwealth* v. *Catalina*, 407 Mass. 779, 791 (1990). See *Commonwealth* v. *McLeod*, *supra* at 745, citing *Commonwealth* v. *Golston*, 373 Mass. 249, 256 (1977), cert. denied, 434 U.S. 1039 (1978) (to supersede defendant's liability, intervening cause must be sole cause, not merely contributing cause). Here, the intervening conduct, in the form of continuing abuse by Perry and others, was reasonably foreseeable given Maynard's knowledge of and participation in the ongoing assaults. In light of the evidence, "it cannot be said that the assault and the abuse by the other participants whom [Maynard] saw abuse and beat the victim constitutes an unforeseeable, independent, intervening cause." *Perry*, *supra* at 228.[7]

3. *Sufficiency of the Evidence on the Kidnapping Charge.*

The kidnapping charge was also submitted to the jury on theories of joint and individual liability. Maynard claims that the Commonwealth's evidence was insufficient to support a conviction on either theory. Because the jurors returned a general verdict, we must again determine whether there was sufficient evidence to support a guilty verdict on both individual and joint liability theories. See *Perry*, *supra* at 230-231. We conclude that there was.

A person is guilty of kidnapping if he, "without lawful

---

[7]Maynard does not contend that the evidence was insufficient to establish the element of extreme atrocity or cruelty.

authority, forcibly or secretly confines or imprisons another person within this commonwealth." G. L. c. 265, § 26. Maynard admitted to police that "Billy was being *held* at the Perry residence" (emphasis added). There was evidence that he was kept upstairs and that "his hands were usually tied." Paige was observed by witnesses, on multiple occasions, bound to his chair or a radiator with his hands tied together. There was evidence that Paige was not allowed to go near the windows or the front door of the Perry house or to use the telephone. There was evidence that Maynard participated in imposing these restraints on Paige. There was testimony that Maynard joined with others in forcibly preventing Paige from coming downstairs to use the bathroom, and subsequently beat him for his attempt to do so. Maynard admittedly participated in tying the victim to a weight bench and was present and ready to render assistance on at least one other occasion when Perry and others bound and gagged the victim. Another witness saw Maynard restrain Paige and hold him in position while others beat him. He was also seen forcing Paige into a bathroom where he and Perry applied household cleaners to his wounds.

This evidence is sufficient to prove that, on a theory of joint liability, Maynard cooperated with others in the Perry household to confine Paige by force and in secret. See *Perry, supra* at 231. It is also sufficient to prove Maynard guilty on a theory of individual liability.

Maynard claims, relying on *Commonwealth* v. *Kickery*, 31 Mass. App. Ct. 720, 723 (1991), that evidence of his restraining Paige during the course of beating or assaulting him cannot be used to support his conviction of kidnapping because those acts of restraint were incident to the assault itself and, therefore, did not constitute the separate crime of kidnapping. *Kickery* is distinguishable in several important respects and does not provide support for Maynard's contentions. The offenses at issue in *Kickery* were assault and battery, aggravated rape, and kidnapping. According to the Appeals Court, "the restraint imposed on the victim . . . prior to and during the rape did not constitute the crime of kidnapping . . . [because] the victim willingly accompanied the defendant . . . to where the rape eventually occurred." *Id.* Further, "nonconsensual 'confinement

or [asportation] [was not] used as a means to facilitate the commission of [the rape].' " *Id.*, quoting *Commonwealth* v. *Rivera*, 397 Mass. 244, 254 (1986). Thus, the Appeals Court held that, while the restraint of the victim during the rape itself was insufficient to support a kidnapping charge, the subsequent conduct of the defendant in tying the victim to a tree did constitute kidnapping and was sufficient to sustain the conviction. See *Commonwealth* v. *Kickery, supra* at 723-724. Because the evidence supporting the kidnapping charge occurred after the commission of the rape, the conviction of aggravated rape on this basis could not stand, but the defendant could nonetheless be properly convicted of both rape and kidnapping as independent offenses. See *id.* As we stated in *Perry, supra* at 231, quoting *Commonwealth* v. *Rivera, supra*: "we are unwilling to adopt a rule that requires the treatment of confinement or asportation used as a means to facilitate the commission of such crimes as merged in the substantive crime." The evidence at trial that Maynard tied Paige up to facilitate efforts to electrocute him, and otherwise assisted in physically keeping Paige confined so that he could be further abused, was sufficient to support Maynard's conviction of kidnapping on both theories of liability.

4. *Maynard's Motion to Suppress his Confession.*

After Paige's body had been found and identified, Massachusetts State troopers spoke to Perry and one of his brothers before turning their attention to Maynard. Early on the morning of June 6, 1995, the troopers located Maynard at his place of employment. He agreed to accompany them back to their office in Greenfield. They advised Maynard of his Miranda rights orally and then provided him with a written copy and a waiver form, which he read and signed. The troopers then questioned Maynard for approximately one hour about his involvement in the death of Paige. At the end of the questioning, Maynard completed a formal written statement admitting his involvement in Paige's death and the disposal of the body.

Prior to trial, Maynard filed a motion to suppress his confession, claiming that during the questioning he asked the officers whether he should have an attorney present and they responded by stating that they could not answer that question, and then continued questioning him about the murder. Maynard contends

that his reference to an attorney should have prompted the officers to cease their questioning, or at least to clarify whether he was in fact requesting an attorney, and that their failure to do so violated his right to counsel. We need not decide whether a suspect's posing of such a question requires the police to cease questioning or pursue another course, because, after holding an evidentiary hearing on Maynard's motion, the judge found that Maynard "neither requested an attorney, nor asked the police whether he should get one." This finding was based on the testimony of the two State troopers who interviewed Maynard, both of whom testified that he neither requested an attorney nor asked if he should have one present during the interview.[8] Questions of credibility in this context are for the trial judge to decide. See *Perry*, *supra* at 233, citing *Commonwealth* v. *Tavares*, 385 Mass. 140, 144-145, cert. denied, 457 U.S. 1137 (1982). When reviewing the denial of a motion to suppress, "we accept the motion judge's subsidiary findings of fact absent clear error." *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 321 (2001), quoting *Commonwealth* v. *Sanna*, 424 Mass. 92, 97 (1997). "The determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw the witnesses . . . ." *Commonwealth* v. *Sinforoso*, *supra*, quoting *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990). We conclude that there was no error in the judge's findings or in his admission of Maynard's confession.

`5. *Prosecutor's Misstatement in Closing Argument.*

Maynard claims that the prosecutor misstated material facts in his closing argument requiring a reversal of the convictions and a new trial. The challenged statement was: "Is there . . . one witness on one day who doesn't see Clinton Maynard in that house during the evening, whether it be Laura White, Wendy Poirier, Melissa Terry, or Frank Parker? . . . I would suggest to you your answer is every time somebody was there in the evening, Mr. Maynard was there." The prosecutor's suggested answer to his rhetorical question was inaccurate in one respect. Frank Parker only observed Maynard at the Perry house on one of three occasions when he visited there in the evening.

---

[8]Maynard did not testify at the hearing on the motion to suppress. He did, however, submit an affidavit in support of his motion.

The Commonwealth concedes that inaccuracy, but argues that the isolated misstatement did not amount to prejudicial error warranting reversal.

The standard for determining whether a conviction must be reversed based on prosecutorial misstatements during closing argument depends in part on whether a specific objection was made at trial. See *Commonwealth* v. *Loguidice*, 420 Mass. 453, 455-456 (1995). No such objection was made in this case. Therefore, we consider the asserted error to be of significance only if it created a substantial likelihood of a miscarriage of justice. See *id.* at 455-456, and cases cited. In making that assessment, the effect of the error is considered in the context of the arguments and the case as a whole. See *Commonwealth* v. *Santiago*, 425 Mass. 491, 500 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998), and cases cited. We consider whether "defense counsel seasonably objected to the arguments at trial . . . whether the judge's instructions mitigated the error . . . whether the errors in the arguments went to the heart of the issues at trial or concerned collateral matters . . . whether the jury would be able to sort out the excessive claims made by the prosecutor . . . and whether the Commonwealth's case was so overwhelming that the errors did not prejudice the defendant" (citations omitted). *Commonwealth* v. *Santiago, supra.*

The absence of an objection, "[a]lthough not dispositive of the issue . . . is some indication that the tone, manner, and substance of the now challenged aspect[] of the . . . argument [was] not unfairly prejudicial." *Commonwealth* v. *Duguay*, 430 Mass. 397, 404 (1999), quoting *Commonwealth* v. *Toro*, 395 Mass. 354, 360 (1985). Thus, the fact that no objection was lodged at trial tends to support the inference that the prosecutor's misstatement was not so egregious and prejudicial as Maynard now claims.

While no specific curative instruction was given in this case, the jury nonetheless were instructed several times that closing arguments of counsel are not to be taken as evidence. At the beginning of the trial, the judge instructed that neither the opening statements nor the closing arguments of counsel were evidence. Immediately before closing arguments, the judge

again instructed the jury: "This final argument is not evidence. It's purely and simply the lawyers' argument to you that based on the facts as they recall [them], they'll urge you to come to certain conclusions. Whether you come to those conclusions or not is entirely up to you. . . . If your recollection of the facts differs from what they say, then you just disregard their statement and you take the facts as you remember them, because you're the sole judges of the facts." Finally, during his charge to the jury, the judge once again cautioned them that "the closing statement is not evidence." The judge's repeated instructions ensured that the jury understood their role as the sole fact finders and were aware that nothing said in closing arguments was to be considered as evidence. The jury are presumed to follow the judge's instructions. *Commonwealth* v. *Stone*, 366 Mass. 506, 513 (1974).

Maynard contends that the prosecutor's misstatement went to the heart of the case in that his presence at the house was a required element for conviction under a joint venture theory. Maynard further claims that the prosecutor's intent was to "invite the jury to render a verdict based upon an inference that was not supported by the evidence in the record." To the contrary, while the extent and frequency of Maynard's presence at the Perry home was clearly an important issue at trial, the Commonwealth adduced substantial evidence of Maynard's presence (including his own admissions) to support the inference by the jury that he regularly visited the Perry home. While the prosecutor's statement during closing contained one inaccuracy, it was tempered by the repeated instructions of the judge and the strong weight of the evidence presented against Maynard on the very issue in question. In sum, it did not create a substantial risk of a miscarriage of justice.[9]

6. *Ineffective Assistance of Counsel.*

Maynard claims that his right to effective assistance of counsel was violated when his trial counsel failed to object

---

[9]Even if an objection had been made, and we were to have reviewed the error against a higher standard, we would conclude that it was harmless and would have made no difference in the jury's result. See *Commonwealth* v. *Purcell*, 423 Mass. 880, 884-885 (1996); *Commonwealth* v. *Francis*, 391 Mass. 369, 373-374 (1984); *Commonwealth* v. *Miles*, 46 Mass. App. Ct. 216, 221 (1999).

anew to the introduction of his statements to the police; and failed to object and seek a curative instruction when the prosecutor misstated material facts in his closing argument. Claims of ineffective assistance of counsel raised on a defendant's direct appeal from a conviction of murder in the first degree benefit from the more favorable standard of review provided by G.·L. c. 278, § 33E. See *Commonwealth* v. *Fisher*, 433 Mass. 340, 353-354 (2001), citing *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). Therefore, in reviewing such a claim under § 33E, we consider whether there was an error by defense counsel during the course of the trial and, if so, whether that error was likely to have influenced the jury's conclusion. See *id.* at 682. See also *Commonwealth* v. *Niemic*, 427 Mass. 718, 726 (1998) (applying "favorable substantial likelihood of a miscarriage of justice standard" of § 33E review). ·

The admissibility of Maynard's statements to the police had already been decided after a hearing on his motion to suppress. However, Maynard claims that his counsel's failure to renew the objection at trial resulted in this issue not being properly preserved for appellate review and thus subject to a less favorable standard of review. This argument is without merit. The applicable standard of review was not affected by counsel's failure to object at trial. The denial of a motion to suppress evidence is reviewable without further objection at trial. See *Commonwealth* v. *Whelton*, 428 Mass. 24, 25-26 (1998), and cases cited. Therefore, trial counsel properly preserved the issue for appeal, and his decision not to object at trial did not result in a less favorable standard for appellate review.

Maynard also claims that his counsel's failure to object and seek a curative instruction when the prosecutor misstated material facts in his closing argument amounted to ineffective assistance. In light of our conclusion that the prosecutor's misstatement during closing argument did not create a substantial likelihood of a miscarriage of justice, and the fact that our standard of review under G. L. c. 278, § 33E, is more favorable to a defendant than our review of a constitutionally based ineffective assistance of counsel claim, *Commonwealth* v. *Murphy*, 426 Mass. 395, 404 (1998), Maynard's argument on this point cannot succeed. Because it has already been determined that the

prosecutor's misstatement does not warrant reversal under G. L. c. 278, § 33E, Maynard cannot now succeed on his ineffective assistance of counsel claim based on counsel's failure to object to that same error. See *id.,* citing *Commonwealth* v. *Waite,* 422 Mass. 792, 807 (1996).

*7. Conclusion.*

We conclude that none of Maynard's claims on appeal warrants reversal. Having reviewed the record pursuant to G. L. c. 278, § 33E, we further conclude that the interests of justice do not require the entry of a verdict of a lesser degree of guilt on the murder conviction or a new trial.

*Judgments affirmed.*