COMMONWEALTH vs. ALBERT JACKSON.

No. 09-P-220.

Plymouth. April 7, 2010. - December 23, 2010.

Present: CYPHER, COHEN, & MILKEY, JJ.

*Homicide. Practice, Criminal,* Assistance of counsel, Opening statement, Instructions to jury. *Constitutional Law,* Assistance of counsel. *Due Process of Law,* Assistance of counsel. *Malice. Evidence,* Hospital record. *Witness,* Impeachment.

A criminal defendant convicted of murder in the second degree failed to demonstrate, in his motion for a new trial, that his trial counsel's decision not to introduce the victim's hospital records in evidence was manifestly unreasonable, where, in the absence of a defense expert to explain the records at trial, the records were not capable of being understood by the jury in a manner that was helpful and not harmful to the defendant; where the subject of the hospital records (i.e., the victim's pre-existing fragility and the existence of other possible triggers of his fatal injury) were well developed at trial; and where the evidence of the nature of the defendant's conduct was so strongly indicative of both second and third prong malice that the introduction of the hospital records would not have made a material difference in the defendant's case. [469-472]

There was no merit to a criminal defendant's argument that trial counsel promised in his opening statement to produce evidence that he knew he would not be able to introduce [472], or that trial counsel was ineffective in failing to impeach prosecution witnesses with their criminal convictions [472-473] or in failing to request an instruction for which there was no basis [473].

INDICTMENT found and returned in the Superior Court Department on March 25, 1996.

A motion for a new trial, filed on December 13, 2004, was heard by *Elizabeth B. Donovan,* J.

*Charles W. Rankin (Michelle Menken* with him) for the defendant.

*Carolyn A. Burbine,* Assistant District Attorney, for the Commonwealth.

COHEN, J. The defendant is currently serving a life sentence

for the murder in the second degree of Walter Poe. In this appeal from the denial of his motion for a new trial, brought on the ground of ineffective assistance of trial counsel, the defendant's primary claim is that counsel unreasonably failed to introduce Poe's hospital records in evidence. The defendant also faults trial counsel for referring in his opening statement to evidence that he was unable to present, for failing to impeach prosecution witnesses with their criminal convictions, and for failing to request an instruction on the reckless and wanton theory of manslaughter.

As to each of these claims, we conclude that the defendant has not met his burden to establish both prongs of the test articulated in *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974): (1) that there was "serious incompetency, inefficiency, or inattention of counsel — behavior . . . falling measurably below that which might be expected from an ordinary fallible lawyer," and (2) that, as a result, the defendant likely was deprived of "an otherwise available, substantial ground of defen[s]e." We reach this conclusion after independent consideration of the trial record and other documentary evidence, but with deference to the determinations of the motion judge as to the credibility of the witnesses who appeared at the motion hearing: Dr. Ira Kanfer, an expert pathologist called by the defendant, and the defendant's trial counsel, who was called by the Commonwealth.[1] See *Commonwealth* v. *Phinney*, 446 Mass. 155, 158 (2006).

*Background.* On the evening of March 13, 1996, the defendant and seven other prisoners, including the victim, Walter Poe, were transported by sheriff's van from the Nashua Street jail to various other facilities. During the trip, Poe, an alcoholic in precarious physical condition, was manifesting symptoms of alcohol detoxification, including hallucinations and incoherent rambling. Annoyed by Poe's behavior, the defendant told him to "shut up" and then administered two sets of powerful kicks to Poe's head and chest, with his right boot. After the second set of kicks, Poe slumped to the floor, mumbling and dazed, at which point the defendant said, "He'll be quiet now."

---

[1] The motion judge, who was not the trial judge, credited trial counsel but did not credit Dr. Kanfer.

By the time the van arrived at its first destination — the detoxification center in Bridgewater — Poe was on the floor, neither moving nor speaking, and three officers had to carry him out of the van. He was unconscious (but breathing) when brought inside. After being examined briefly by a staff nurse, he was taken to Brockton Hospital where tests were performed, including a computed tomography (CT) scan of his head. He then was transferred to Boston City Hospital, where he died the following afternoon. The immediate medical cause of death was an acute subdural hematoma.

On March 25, 1996, the defendant was indicted for Poe's murder. At his jury trial, in December, 1997, the defendant was represented by counsel appointed by the Committee for Public Counsel Services from its "murder list." Trial counsel had decades of experience defending criminal cases, including substantial experience in homicide cases.

The defendant's preferred strategy was an "all or nothing" defense — he did not wish to present the jury with an opportunity to convict him of involuntary manslaughter. Counsel tried the case accordingly, primarily emphasizing lack of causation (i.e., that the victim already was suffering from his fatal injury when he encountered the defendant), but also contending that the defendant's actions were designed only to quiet the victim and lacked malice.

The defense suffered a setback at the outset of the trial, when Dr. Edward Sussman, a pathologist retained as a defense expert, told counsel not to call him to testify, because he had come to the conclusion that the defendant's kicks had caused Poe's death. As a result, Dr. Sussman did not take the stand, although he remained in the courtroom and consulted with counsel with respect to the cross-examination of the Commonwealth's expert pathologist, Dr. Leonard Atkins, a Suffolk County medical examiner of long standing. As described further below, during that cross-examination, defense counsel succeeded in eliciting testimony that was helpful to the defense.

Defense counsel also was able to make use of evidence that, several hours before encountering the defendant, Poe was assaulted by another person in custody, Joseph Nichols, as they awaited arraignment at the District Court in Dorchester. Nichols

testified at trial that he had pushed Poe after Poe grabbed a sandwich out of his hands, and that, as a result, Poe fell against a door, but then got up without any visible injury. On cross-examination, however, defense counsel was able to extract a concession from Nichols that previously he had stated, "I knocked him out." This prior inconsistent statement came in without objection and for all purposes.

At the close of the Commonwealth's case, defense counsel became concerned about the strength of the evidence against the defendant. When, contrary to counsel's recommendation, the defendant decided that he did not want to testify, counsel advised him that they ought to introduce the victim's medical records because it would give the jury some reason not to find him guilty of murder. The defendant responded, "No, you did a good job. All or nothing."

Notwithstanding the defendant's preferred strategy, the judge charged the jury on involuntary manslaughter in addition to two theories of murder in the first degree (deliberate premeditation and extreme atrocity or cruelty) and murder in the second degree. The record reflects that the involuntary manslaughter theory was included in the charge with the tacit encouragement of defense counsel, despite a formal objection made in accordance with the defendant's wishes.

In January, 2000, this court, in an unpublished memorandum and order, affirmed the defendant's conviction of murder in the second degree, concluding, among other things, that "the evidence . . . was more than sufficient under both the second and third prongs of malice" to warrant the jury's verdict.[2] *Commonwealth* v. *Jackson*, 48 Mass. App. Ct. 1114 (2000). Almost five years later, the defendant filed his motion for a new trial. In connection with that motion, the defendant was permitted to obtain discovery and was granted funds to secure the services

---

[2]"Malice as an element of murder may be proved by evidence establishing any one of three [so-called prongs of malice]: . . . (1) the defendant intended to kill the victim (the . . . first prong . . .); or (2) the defendant intended to do the victim grievous bodily harm (the second prong); or (3) in the circumstances known to the defendant, a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that death would follow the contemplated act (the third prong)." *Commonwealth* v. *Vizcarrondo*, 427 Mass. 392, 394 n.3 (1998), quoting from *Commonwealth* v. *Sneed*, 413 Mass. 387, 388 n.1 (1992).

of an investigator and an expert pathologist. In September, 2008, after an evidentiary hearing before a judge other than the (retired) trial judge, the defendant's motion for a new trial was denied.

*Discussion.* 1. *Hospital records.* The defendant claims that Poe's hospital records contained powerful exculpatory material. In particular, the defendant points to a report by the radiologist who evaluated the CT scan of Poe's head that was performed at Brockton Hospital. The report states that the images suggested the existence of a "chronic subdural hematoma" as well as an "acute subdural hematoma." According to the defendant, this observation, which is repeated in other parts of the medical records, could not fail to have alerted the jury that the victim had a serious pre-existing condition that put him at great risk of fresh bleeding from even a minor impact. Thus, the defendant argues, when coupled with other material in the records (e.g., references to a recent history of seizures, normal X-rays of other parts of the victim's body), as well as evidence of the assault at the District Court in Dorchester, the results of the CT scan likely would have persuaded the jury either that the defendant's actions played no role in bringing about the victim's death, or that the amount of force used by the defendant was insufficient to create an inference of malice.

In assessing the defendant's claim, a threshold issue is whether his rejection of counsel's recommendation to admit the records forecloses him from raising it. The defendant argues that defense counsel is primarily responsible for deciding what evidence to present, and that, in this instance, counsel acted unreasonably in failing to override the defendant's wishes. The Commonwealth, for its part, claims that the defendant must be held to the consequences of his choice — particularly where he has submitted no affidavit or other evidence to suggest that he was uninformed of the records' utility or the risk of proceeding without them. We need not decide this question, however, because the decision not to introduce the hospital records — even if solely committed to counsel's discretion — was not manifestly unreasonable. See *Commonwealth* v. *Hurley*, 455 Mass. 53, 70 (2009), and cases cited.

As matters stood, the defendant had no expert witness at trial

to explain the records. Without such interpretive assistance, they would not have been particularly illuminating,[3] and may have done more harm than good. Absent expert explanation, it is highly doubtful that the jury would have understood the significance of the CT scan report noting a "chronic" as well as an "acute" subdural hematoma. At the same time, however, the jury would have been exposed to another finding in the same CT scan report — that there was a "nondepressed fracture" of the victim's skull — a fact that was not brought out during the Commonwealth's case. With no expert to opine that the fracture was not new,[4] there was a risk that the jury would assume that it resulted from the defendant's kicks to the victim's head. Thus, rather than helping the defendant, the hospital records had the potential to cement the conclusion that the defendant's kicks were so forceful that they reflected either second or third prong malice, and that his actions were a proximate cause of the victim's death. Indeed, the records may have increased the risk of a guilty verdict of murder in the first degree on the theory of extreme atrocity or cruelty.

In any event, even if the hospital records standing alone were capable of being understood by the jury in a manner that was helpful and not a double-edged sword, we are not persuaded that their introduction would have made a material difference in the case. See *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977). Even without the records, Poe's pre-existing fragility and the existence of other possible triggers of his fatal bleed were well developed at trial, particularly during the testimony of Dr. Atkins. Still, the jury were not swayed.

On direct examination, Dr. Atkins explained that Poe suffered from severe cirrhosis of the liver, which would have caused him to bleed very readily. On cross-examination, Dr. Atkins acknowledged that Poe had been hospitalized two days earlier for seizures,

---

[3]The inconclusiveness of the medical records standing alone is well-illustrated by the defendant's citations to Dr. Kanfer's testimony (which the motion judge expressly discredited) and medical publications (which were not part of the record below), in order to explain the importance of the records to his defense.

[4]In his testimony during the motion hearing, Dr. Kanfer opined that the fracture must not have been fresh because the radiologist also reported that the scan showed no adjacent soft tissue swelling of the scalp.

which, while probably related to alcoholism, could have been the result of an injury or fall; that Poe had discharged himself from the hospital against medical advice; that alcoholics tend to fall and "bang" themselves more frequently and may strike their heads a number of times, causing subdural hematomas that grow over a period of time as they rebleed; that a slight injury could cause a "big" hematoma depending on the condition of the person's head and other factors; that Poe's acute subdural hematoma may have been triggered at noontime (when the altercation with Nichols took place) or early that morning or even the night before; and that the witness's opinion of the origin of the fatal subdural hematoma possibly would have been affected had he been told that Poe had suffered a "significant bump" — and not just a "slight" injury — when Nichols assaulted him. The jury nevertheless concluded, after appropriate instruction,[5] that the defendant's acts were a proximate cause of Poe's death.

With respect to malice (see note 2, *supra*), the defendant greatly overstates the utility of the medical records. The defendant's acts, and not the victim's condition, were the strongest indication of his mens rea, and there was no ambiguity as to the nature of those acts. It was not contested that the defendant acted deliberately.[6] Furthermore, as the kicks were described by the eyewitnesses, a finding of either second or third prong malice was virtually inescapable.[7] See *Commonwealth* v. *Hicks*, 356 Mass. 442, 445 (1969).

---

[5]The judge correctly charged the jury on causation, explaining that there may be more than one proximate cause of death, see *Commonwealth* v. *Maynard*, 436 Mass. 558, 563 (2002), and that a pre-existing physical condition does not preclude criminal liability because the defendant "takes the victim as he finds him." See *Commonwealth* v. *Starling*, 382 Mass. 423, 429 (1981); *Commonwealth* v. *Tevlin*, 433 Mass. 305, 313 (2001).

[6]In addition to the eyewitness testimony, an inmate at the same facility where the defendant was incarcerated prior to trial testified about a conversation that the two of them had in the prison library. The defendant told the other inmate that he had kicked Poe deliberately, demonstrated what he did, and then expressed his expectation that he nevertheless would "beat" the charge.

[7]The testimony was that the defendant delivered two separate sets of hard, thrusting kicks to the victim's head and chest, using a boot-clad foot. The witnesses variously described the kicks in the following terms: "raised foot up kick thrust, really hard, like you'd kick at a door"; connecting with "a loud thumping sound"; defendant "leaned back . . . and lifted up his legs and

Contrary to the defendant's position, there also were significant outward signs of injury that corroborated the nature and force of the kicks. Several witnesses testified that, prior to entering the van, Poe showed no visible injuries other than possibly a small cut or bruise on the side of one eye. At autopsy, however, Poe's body exhibited contusions and abrasions on his face and head, which were described by Dr. Atkins and shown on postmortem photographs introduced in evidence. In addition, there was evidence from which the jury could have concluded that the kicks drew blood: a chemist testified that blood was found on the defendant's boot, as well as in the area of the van where Poe had been seated. In short, the evidence of the nature of the defendant's conduct was so strongly indicative of both second and third prong malice that the introduction of the medical records would not have made a material difference in the defendant's case.

2. *Counsel's opening statement.* The defendant claims that, in his opening statement, counsel made promises about forthcoming evidence that he knew he would not be able to introduce. It is evident from the transcript, however, that the wording of counsel's opening statement was equivocal and not a promise. It also is evident that counsel had made and was continuing to make efforts to secure the relevant witnesses' attendance at the trial, but ultimately was unsuccessful.

Regardless, even without the benefit of the absent witnesses, counsel was able to develop the theme he had outlined in his opening statement. He established that the altercation between Poe and Nichols could have resulted in a serious injury, and elicited evidence of other possible causes of Poe's fatal acute subdural hematoma. We discern neither ineffective assistance nor prejudice.

3. *Impeachment.* Counsel was not ineffective in failing to use prior convictions to impeach Nichols and the three prisoners who were in the van with the defendant and Poe. "Impeachment of a witness is, by its very nature, fraught with a host of

kicked . . . hard thrust kicks"; "knee going up in the air"; "like someone punching a bag"; defendant's leg came up "about waist high"; kicks done "with the bottom of [the defendant's] boots"; "very powerful"; and delivered from "maybe three feet" away.

strategic considerations," to which the court shows deference. *Commonwealth* v. *Fisher*, 433 Mass. 340, 357 (2001). Here, counsel's decision was not unreasonable given the Hobson's choice created by the trial judge's ruling, see *Commonwealth* v. *Knight*, 392 Mass. 192, 194 n.1 (1984), that, if the defendant elected to impeach the Commonwealth's witnesses with their convictions, the Commonwealth would be allowed to impeach the defendant with some of his convictions. The fact that the defendant ultimately elected not to testify is beside the point. See, e.g., *Commonwealth* v. *King*, 445 Mass. 217, 227-228 (2005), cert. denied, 546 U.S. 1216 (2006).

In any event, where it was self-evident that each of the witnesses in question had been involved in criminal activity, it is speculative to assume that a different approach to impeachment would have affected the jury's decision. Again, the defendant has failed to meet either prong of the *Saferian* test.

4. *Requests for jury instructions.* Defense counsel was not ineffective for failing to request an additional instruction on wanton and reckless manslaughter after the judge instructed (over the defendant's objection) that involuntary manslaughter was a battery causing death. There was no basis for a finding of wanton and reckless behavior other than the uncontested fact that the defendant deliberately kicked the victim and, hence, committed an intentional battery. The jury's finding of malice shows that, even if requested and given, an instruction on wanton and reckless manslaughter would have been futile.

*Conclusion.* The order denying the defendant's motion for a new trial is affirmed.

*So ordered.*