NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12436

COMMONWEALTH  vs.  JONATHAN NIEMIC.


Bristol.     April 5, 2019. - November 19, 2019.

Present: Gants, C.J., Lenk, Lowy, Budd, & Cypher, JJ.


Homicide. Constitutional Law, Double jeopardy. Practice,
    Criminal, Double jeopardy, Verdict, Witness, Argument by
    prosecutor, Instructions to jury, Capital case. Evidence,
    Rebuttal, Impeachment of credibility, Medical report,
    Argument by prosecutor. Witness, Impeachment. Jury and
    Jurors.



    Indictment found and returned in the Superior Court
Department on December 9, 2010.

    Following review by this court, 472 Mass. 665 (2015), the
case was tried before Renee P. Dupuis, J.


    Theodore F. Riordan (Deborah Bates Riordan also present)
for Jonathan E. Niemic.
    Tara L. Johnston, Assistant District Attorney, for the
Commonwealth.


    LENK, J.  In 2012, the defendant was convicted of murder in

the first degree on a theory of extreme atrocity or cruelty in

the stabbing death of Michael Correia on October 20, 2010.

Following the defendant's appeal from that conviction, we remanded the matter to the Superior Court, where the Commonwealth was given the option either of vacating the conviction and retrying the defendant on the murder indictment, or accepting a reduction of the verdict to manslaughter. See Commonwealth v. Niemic, 472 Mass. 665, 667, 679 (2015) (Niemic I). The Commonwealth elected to pursue a new trial. At that trial, with a different judge presiding, another attorney for the defendant, and the same prosecutor, the jury convicted the defendant of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty.

In this appeal, the defendant argues that a new trial is required because of four asserted errors at his second trial: a violation of the protection against double jeopardy in pursuing the theory of deliberate premeditation, where the jury at the first trial had not checked the "guilty" box on the verdict slip for that theory; erroneously admitted testimony of a rebuttal witness, which later was treated as substantive evidence by the Commonwealth; improperly introduced testimony by a substitute medical examiner as to facts in the autopsy report; and a number of improprieties in the prosecutor's closing argument, including an issue repeated from the defendant's first trial. The defendant also asks us to exercise our authority under G. L. c. 278, § 33E, to reduce the degree of guilt or to order a new

trial.

We conclude that errors in the closing argument alone, both that are reprised from the first trial and those newly introduced, would require a new trial. To the extent that this may be a close question, that determination is buttressed by other issues that emerged on our review pursuant to G. L. c. 278, § 33E. Accordingly, the defendant's conviction of murder in the first degree shall be vacated and set aside. On remand, the Commonwealth shall once again be given the option either of accepting a reduction in the verdict to manslaughter, or of retrying the defendant.

Should the Commonwealth again choose to pursue the latter path, we recognize the costs that a third trial would occasion, on the parties, the witnesses, the victim's family, and the court. We are nonetheless constrained to conclude that a new trial is necessary unless the Commonwealth decides to accept a reduced verdict. See Commonwealth v. Kater, 388 Mass. 519, 534 (1983), S.C., 394 Mass. 531 (1985), 409 Mass. 433 (1991), 412 Mass. 800 (1992), and 432 Mass. 404 (2000).

1. Background. We recite the facts as the jury could have found them, in the light most favorable to the Commonwealth, reserving certain details for later discussion. The victim was stabbed five times; any one of the wounds could have been fatal. The defendant testified at trial that he had stabbed the victim;

the primary issue before the jury was whether he had done so in self-defense. The theory of defense was that the older, taller, and heavier victim initiated a fist fight, and then pulled out a knife; the defendant managed to wrench the knife from the victim and swung wildly to fend off the victim.

a. Facts. In the summer of 2010, the defendant was twenty-two years old and living in a halfway house in New Bedford for individuals who were recovering from alcohol and drug abuse. He was dating Lisa Weaver, who lived at a different sober house in New Bedford. During his time at the halfway house, the defendant befriended his roommates, James Nason and Nathan Goodwin. The defendant also introduced Nason to his friend Kari Wright, and the two began dating.

In August of 2010, the defendant left town for approximately two months. When he returned, he moved in with his grandmother in New Bedford. While he was away, the defendant wrote Weaver two love letters describing how "perfect" she was, and how he missed her and imagined them being together. At the same time, however, Weaver and the victim[1] appeared to have begun a romantic relationship; they were seen in public on a number of occasions flirting, holding hands, and kissing.

The defendant returned to New Bedford in October 2010. A

---

[1] The victim was then thirty-four years old.

few days before the stabbing, Nason told the defendant about the relationship between Weaver and the victim. Nason also said that the victim had referred to the defendant as a "punk," and had bragged that the victim "could take any girl away from [the defendant]." The defendant told Nason that when they next met, he would punch the victim in the head.[2] A friend of Weaver, who was her roommate at the sober house, testified that, at some point a few days prior to the stabbing, the defendant had appeared at an alcoholics anonymous (AA) meeting looking for the victim.

On October 19, 2010, Weaver, Wright, and Nason picked up the defendant in a sport utility vehicle (SUV) belonging to Wright's mother. Weaver and the defendant embraced when they saw each other, and sat together in the rear seat. At some point, Wright heard the defendant angrily asking, with reference to an unknown topic, "Why didn't you tell me that?" The group spent the day at Wright's parents' house, where the relationship between Weaver and the defendant seemed affectionate, as usual. The group left so that Weaver could get back to the sober house before her 11 P.M. curfew. They planned to meet the following day to paint a property in Abington that belonged to Weaver's

---

[2] The defendant was interested in becoming a professional fighter, and for "a couple of" months had been working out at a gym, training on punching the heavy bag.

parents.

On October 20, 2010, at approximately 3 P.M., the defendant, Weaver, Nason, and Wright arrived at the building in Abington, and painted until 6:30 P.M., when it got dark. They left intending to return to New Bedford. En route, Weaver realized that she did not have her house key. She then remembered that some of her housemates would be attending an AA meeting at a soup kitchen at New Bedford, which regularly took place from 7 P.M. until 8:30 P.M. on Wednesdays, and decided that she could later enter the sober house with them. The four thus headed to the soup kitchen. On the way, the defendant asked Nason to stop at the side of the road because he had to urinate, but Wright would not allow this, as neither she nor Nason had a valid driver's license, and she did not want Nason to be caught at the side of the road if any police officers passed by.

Between seventy and one hundred twenty people attended the meeting that evening. The defendant, Weaver, Nason, and Wright reached the soup kitchen shortly before the usual break between 7:30 and 7:45 P.M., when many people would go outside to smoke. Nason parked approximately 200 yards from the front door. Wright remained in the vehicle, while the others headed to the soup kitchen. They encountered their former roommate Goodwin standing outside. Nason and the defendant chatted with Goodwin

for approximately five minutes, and then went inside to use the restroom. Weaver also went into the building to use the restroom, and then joined the crowd outside.

When the defendant and Nason returned to the vehicle, the break had begun and numerous meeting participants were heading outside. Nason pointed out to the defendant that the victim was at the meeting, and then returned to the SUV.

At that point, approximately eighty people were outside, in a small, crowded area. The victim and Goodwin were standing approximately fifteen feet from the entrance to the soup kitchen, looking at something on a cellular telephone. The defendant went over to talk to Weaver, who was standing on the corner near a crosswalk approximately thirty feet away from the victim. Nason moved the SUV closer to the crosswalk, and stayed inside with the vehicle idling. The defendant gestured to the victim, indicating that he wanted to talk. The victim apparently held up a finger, in a "just a minute" gesture. The defendant gave Weaver "a quick goodbye kiss." She seemed "concerned" and appeared to try to "pull[] him back" from talking to the victim, and then the defendant and Weaver kissed again.[3] At some point, the defendant pulled the hood of his

---

[3] The evidence as to the extent of physical contact between the defendant and Weaver, like much other testimony, differed widely, ranging from descriptions of talking only, to a brief goodbye kiss or a peck on the cheek, to more protracted kissing

sweatshirt up.  He crossed the street and opened the rear passenger door of the SUV as though he were about to get in, but then left the door slightly ajar and walked over to the victim.[4]

The defendant said, "I've been hearing some things.  I feel disrespected"; the victim asked what the defendant had heard. The defendant began punching the victim, aiming at his head, while the victim attempted to ward off the blows.[5]  The defendant tried to hold the victim in a headlock, but the victim broke free.  At some point, the victim lifted his arms up with his palms facing outward and said something to the effect of, "What? Are you going to use a knife?"[6]  The defendant lunged at the

---

or hugging before and as the defendant was heading away, when Weaver grabbed him by the arm and pulled him back.

[4] Multiple witnesses testified for the Commonwealth and also during the defendant's case.  Their descriptions of events surrounding the confrontation varied widely, even among witnesses for the Commonwealth.  As with much of the other testimony about the confrontation, the testimony on this point was conflicting.  Only two of the ten witnesses who described the events mentioned the defendant as going over to the SUV and then returning to the victim; none of the other witnesses testified that the defendant went to the SUV before he approached the victim.  We present the testimony in the light most favorable to the Commonwealth.

[5] Wright noticed the altercation and got out of the SUV to break up the fight, but dropped her cellular telephone, and its battery fell out.  By the time she had retrieved the battery and the telephone, the defendant was getting into the rear seat of the SUV, so Wright returned to the front seat.

[6] Both the defendant and the victim were known at times to have carried knives.  The knife used in the stabbing had a black

victim four to five times.  The victim ran into the soup kitchen.  The defendant chased him into the building.  About twenty seconds later, the defendant ran out of the building and into the SUV; the vehicle then was driven away.[7]

Bystanders carried the victim, who was saying that he had been stabbed and that someone should telephone 911, upstairs to the meeting hall and tried to render first aid.  His father was present.  Emergency medical technicians (EMTs) arrived within a few minutes.  The victim lost consciousness shortly thereafter.  He was taken to a hospital by ambulance, where physicians attempted emergency surgery, but their efforts were unsuccessful and the victim was pronounced dead.  He had suffered five stab wounds, any one of which could have been fatal.  The two wounds on the left side of the chest had penetrated the heart, and a wound to the lower right side had perforated the liver.  The

---

handle and a black blade, different from the knife the defendant had been known to carry, but both were "flick" knives.

[7] A number of witnesses testified that when the defendant initially confronted the victim, the victim threatened to stab the defendant or punched him in the head.  The defendant testified that the victim threatened to stab him, and then quickly punched him on the side of his head, before reaching down into a pocket and pulling out a knife.  The defendant wrenched the knife away, while the victim continued to attack the defendant.  The defendant then started swinging wildly with the knife.  Other witnesses said that there was a "fist fight" and they could not see who threw the first punch.  After a flurry of punches, the victim eventually backed off, and the defendant ran to the SUV.

fourth and fifth wounds were to the back and the lateral part of
the chest. The victim was determined to have died within
minutes of the stabbing.

Meanwhile, the SUV, with Nason driving, headed toward the
highway. The defendant noticed that he had blood on his hands.
Wright also noticed the blood and that the defendant had a small
black folding knife in his lap. The defendant told the others
that he had been in a fight with the victim, he thought he had
stabbed the victim, and he hoped the victim was "ok." The
defendant wanted to go to his grandmother's house, but Wright
told Nason to drop him off at a grocery store in Fairhaven. The
defendant threw the knife out the window near the exit to the
grocery store.

When they reached the grocery store parking lot, the
defendant cleaned the blood from his hands, with Wright's help,
using one of her tank tops that had been in the back of the SUV.
He discarded the tank top in the parking lot. The others headed
to Wright's parents' house, and the defendant waited at the
grocery store until his grandmother picked him up.

At 8:30 P.M., the defendant and his grandmother went to the
home of John Voisine, the stepfather of a close friend of the
defendant's. The defendant borrowed some clothes from Voisine,

and remained in his apartment for approximately four hours.[8]  The defendant told Voisine he had been in a fight with the victim, that he was worried the victim might be dead, and that he had not intended to harm the victim, but had been acting in self-defense.  The defendant left sometime before midnight.

That evening, police interviewed multiple witnesses.  They investigated the grocery store parking lot and discovered a discarded tank top covered with blood.  In a grassy area near the highway, police found a small black folding knife, covered with red-brown stains.  Around midnight, officers went to Voisine's apartment.  The defendant was not in the apartment, but officers eventually found him under a set of exterior stairs and arrested him.[9]

Deoxyribonucleic acid from the blood on the knife handle, the blade, and the tank top contained a mixture of two profiles, with the "major profile" matching the defendant's; the minor profile on the tank top did not match the victim's.  The victim was a potential contributor to the minor profile on the knife handle and the blade.  The major profile of the stains on the

---

[8] The defendant later testified that he went to Voisine's house to use heroin, as that was the only thing he could think to do at the time.

[9] The defendant had one cut on his right hand and three on his left hand.

jeans that the defendant had been wearing, which were found at Voisine's house, matched the defendant's.

The defendant called a number of witnesses, and also testified on his own behalf. Several defense witnesses testified that when the defendant initially confronted the victim, the victim threatened to stab the defendant.[10] The victim then punched the defendant on the side of his head, before reaching down and pulling out a knife. The defendant wrenched the knife away, while the victim continued to attack. The defendant ultimately was able to run to the SUV.

b. Prior proceedings. In December 2010, the defendant was indicted on a charge of murder in the first degree, G. L. c. 265, § 1. After an eight-day trial in June 2012, a Superior Court jury found the defendant guilty of murder in the first degree on a theory of extreme atrocity or cruelty. In September 2015, after review of the defendant's direct appeal by this court, the matter was remanded to the Superior Court for entry of a reduced verdict of guilty of voluntary manslaughter or a new trial, as the Commonwealth preferred. See Niemic I, 472 Mass. at 667, 679.

Prior to the defendant's second trial, he moved to preclude

---

[10] Nason also testified that, a few months prior to this incident, the victim had threatened to "slice" the defendant if they saw each other again, and then later apologized to the defendant for making the threat.

the Commonwealth from pursuing the theory of deliberate premeditation, and later filed a motion to dismiss the charge of murder in the first degree on that theory. Both motions were denied. After a ten-day trial in September 2016, tried by the same prosecutor[11] but with different defense counsel and before a different judge, a jury convicted the defendant of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty.

2. Discussion. In this direct appeal, the defendant maintains that a new trial is required due to a violation of the protection against double jeopardy in pursuing the theory of deliberate premeditation after a purported acquittal. He also claims error in the introduction of impeachment testimony of a rebuttal witness, which was later treated as substantive evidence by the prosecutor; impermissible testimony by a substitute medical examiner; and a number of improprieties in the prosecutor's closing argument. We consider each issue in turn.

a. Double jeopardy. At his first trial, the defendant was convicted of murder in the first degree on a theory of extreme atrocity or cruelty. The jury checked the guilty box on the verdict slip for this theory, the foreperson presented it as the

---

[11] The second chairs, who did not argue, differed.

theory underlying the conviction, and the jurors all agreed that they found the defendant guilty under that theory. See Niemic I, 472 Mass. at 666. On the verdict slip concerning murder on a theory of deliberate premeditation, the jury checked neither the "guilty" nor the "not guilty" box. The foreperson also made no reference to the theory of deliberate premeditation when responding to the session clerk in announcing the verdict. At the second trial, the defendant was convicted on both theories.

The defendant now contends that the jury found him not guilty of murder on a theory of deliberate premeditation at his first trial, based on their failure to check that box. Therefore, he claims, it was a violation of the double jeopardy clause of the Fifth Amendment to the United States Constitution to have retried him on that theory a second time.

This court repeatedly has declined to accept a jury's failure to mark one of the theories of a charge as an acquittal on that theory. See Commonwealth v. Carlino, 449 Mass. 71, 78-79 (2007), and cases cited; Commonwealth v. Nardone, 406 Mass. 123, 132-134 (1989); Commonwealth v. Preston, 393 Mass. 318, 320, 325 n.8 (1984). Courts in other jurisdictions also have determined that retrial is not barred in such circumstances. See United States v. Ham, 58 F.3d 78, 84-86 (4th Cir.), cert. denied, 516 U.S. 986 (1995); Beebe v. Nelson, 37 F. Supp. 2d

1304, 1307-1308 (D. Kan. 1999); State v. Pexa, 574 N.W.2d 344, 347 (Iowa 1998). We see no reason to disturb our well-established precedent in this case.

The defendant argues further that because silence was interpreted as "no" with respect to the absence of a response to a question to the venire during empanelment (when no members of the venire raised their hands in response to some of the judge's questions), silence likewise must be interpreted as "no" in the context of unmarked boxes on the verdict slip. We do not agree.

There is no indication that the jury were aware that silence on a particular theory would be deemed an acquittal. Rather, they were told that they had to be unanimous in deciding whether the defendant was guilty or not guilty, and that the foreperson was "simply to put an X or a check mark next to the appropriate verdict and then sign it certifying that it's unanimous." They were instructed further that, if they found the defendant guilty, they had to be unanimous as to which of the "two types of murder in the first degree [they found]. . . . [I]t can be one, or the other, or both."

We cannot ascertain by the jury's silence on the theory of deliberate premeditation whether they actually reached a unanimous decision to acquit the defendant on that theory. By contrast, we do know definitively that the first jury were unanimous in their conviction on a theory of extreme atrocity or

cruelty at the first trial.  Thus, retrial on the theory of deliberate premeditation was not error.

b.  Rebuttal testimony.  Toward the end of trial, after the defendant had rested his case, the Commonwealth recalled Wright as a rebuttal witness.[12]  Over the defendant's objection, she testified that, as the defendant approached the victim, Nason said "[the defendant] wants to sucker Mikey [(the victim)].  Sucker punch Mikey."  While the testimony was admitted for the limited purpose of impeaching Nason's credibility, neither party requested a limiting instruction.[13]

---

[12] At the beginning of trial, the judge conducted a hearing on the defendant's motion in limine to introduce certain statements made in the SUV by the defendant after the stabbing. The judge then ordered the statements excluded on the representation of the prosecutor that the Commonwealth would not be seeking to introduce any of the other statements made by the occupants of the vehicle.  On direct examination by the defendant, Nason testified that, on the evening of the stabbing, he was not expecting a physical confrontation between the defendant and the victim when the defendant headed toward the victim.  On cross-examination, Nason testified that, several days earlier, the defendant had told Nason that the next time he saw the victim, he was going to "punch [the victim] in the head."  Nason added that he had not believed that the defendant intended to act on the statement, which Nason viewed as something "everybody says."  On further questioning, Nason testified that he did not remember having told Wright, while they were in the SUV, that the defendant planned to "sucker punch" the victim.  After the defense rested, the judge then allowed the prosecutor to recall Wright to impeach Nason's testimony with her own recollection of his prior inconsistent statement.

[13] Before her final charge, on her own initiative, the judge instructed the jury on the limited purpose for which they could consider Wright's rebuttal testimony that Nason told her the

The defendant now challenges the admission of Wright's testimony as reversible error on the ground that it was irrelevant and impermissible hearsay.[14]  Because the statements concerned the core issue at trial of the defendant's intent in approaching the victim -- in the defendant's words, "the most important issue in the case" -- the defendant maintains that their improper admission constituted prejudicial error.  We do not agree.

There was no error in the introduction of Wright's rebuttal testimony that the defendant wanted to "sucker punch" the victim in order to impeach Nason's testimony.  The testimony had the potential to undermine Nason's credibility in the eyes of the jury, given Nason's testimony on cross-examination that he did not recall telling Wright the defendant had wanted to sucker punch the victim, and, indeed, believed that the defendant

_____

defendant intended to "sucker punch" the victim.  See part 2.d, infra.

[14] Because the defendant objected at trial to the introduction of the rebuttal testimony, we review for prejudicial error.  See Commonwealth v. Barbosa, 477 Mass. 658, 673 (2017), citing Commonwealth v. Canty, 466 Mass. 535, 545 (2013) (reviewing for prejudicial error where objection was preserved).  "An error is not prejudicial if it 'did not influence the jury, or had but very slight effect'; however, if we cannot find 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error,' then it is prejudicial." Canty, supra, quoting Commonwealth v. Cruz, 445 Mass. 589, 591 (2005).

approached the victim simply to talk.  See Commonwealth v. Pina, 430 Mass. 66, 76 (1999), overruled on another ground by Commonwealth v. Colon, 482 Mass. 162 (2019).  Testimony reporting a prior out-of-court statement that "tend[s] to contradict [the declarant's] testimony . . . [is] admissible" for purposes of impeachment.[15]  Id., quoting Commonwealth v. Cataldo, 326 Mass. 373, 377 (1950).  See Mass. G. Evid. § 613(a)(2), (3) & note (2019).  "Although there is discretion involved in determining whether to admit or exclude evidence offered for impeachment, when the impeaching evidence is directly related to testimony on a central issue in the case, there is no discretion to exclude it."  Mass. G. Evid. § 613(a)(4) note, citing Commonwealth v. McGowan, 400 Mass. 385, 390-391 (1987).

The rebuttal testimony was particularly important here for two reasons.  First, as the defendant argues, it concerned the seminal issue in the case:  the defendant's intent at the time he approached the victim.  Secondly, the evidence of that intent rested in large part on the jury's view of the witnesses' credibility, in a case in which almost all the witnesses described the events in significantly different ways, many had

---

[15] Under certain conditions, not present here, a prior inconsistent statement made under oath may be admissible not just to impeach a declarant's trial testimony, but also for its truth.  See Mass. G. Evid. § 801(d)(1)(A) (2019).

known the victim, the defendant, or both, and many were vulnerable to impeachment. Both Wright, the Commonwealth's primary witness,[16] and Nason, who testified for the defense, had been friends of the defendant. Both had been present in the SUV with the defendant driving to the soup kitchen, and driving away after the stabbing, thus leaving either of them open to possible impeachment.[17]

Although there was no error in the introduction of the rebuttal testimony for impeachment purposes, the later use of the statement as substantive evidence in closing is another matter. See part 2.d, infra.

c. Autopsy report. The defendant challenges the introduction of information in the autopsy report that was introduced by a substitute medical examiner. The Commonwealth filed a motion in limine to introduce the testimony of Dr. Henry

---

[16] There was evidence from which the jury could have concluded that Wright's testimony was not unbiased and she had a reason to cooperate with the prosecution. The defendant used Wright's tank top, which she had handed to him, to clean blood from his hands, and she helped him to do so by pouring water on them. Wright testified that, within minutes after she and Nason returned to her parents' house from dropping the defendant at the grocery store, police arrived. She and Nason accompanied the officers to the police station, where she remained until 3 or 4 A.M. At the station, police took photographs, swabbed her hands and took a sample of her deoxyribonucleic acid.

[17] Moreover, although Wright testified at the second trial that she and Nason were at that point broken up, the two had remained in an "on and off" romantic relationship "for years" and had two children together.

Nields, a substitute medical examiner, as the original medical examiner, Dr. William Zane, was unavailable at the time of trial. The defense objected to the use of a substitute due to a concern that the defendant would be unable to elicit testimony from Zane that the victim had had an injury to his lip, which defense counsel viewed as supporting the theory that the encounter began as a fist fight.

The Commonwealth offered either to stipulate to Zane's prior testimony or to conduct a video-recorded deposition that could be played at trial, rather than to rely on Nields's testimony. The defendant rejected both of these options. Before Nields testified, the judge reminded both parties of the limitations on permissible testimony when using a substitute medical examiner, and reminded defense counsel that he had a duty to object individually to each question he thought violated the limitations on the introduction of underlying facts from the autopsy report.

Defense counsel did not object to the prosecutor's questioning of Nields, nor to the introduction of the answers elicited directly from the autopsy report. Indeed, the evidence from the autopsy report was introduced after defense counsel stated explicitly, with respect to a question from the Commonwealth about an injury to the victim's mouth that was not clearly visible on the autopsy photographs, that he had no

objection to evidence from the autopsy report being introduced on that particular issue. On appeal, however, the defendant challenges the introduction of two different sets of facts from the autopsy report, as well as the prosecutor's emphasis on the improperly admitted evidence in his closing argument.[18] In particular, the defendant points to information on the height and weight of the victim and the depth and nature of the victim's wounds.

Nields testified, in response to an unobjected-to question from the prosecutor specifically asking about the content of the autopsy report, that the autopsy report described the victim as being five feet, eight inches tall, and weighing approximately one hundred and seventy-five pounds. This evidence touched upon an important component of the defense strategy: the defendant argued that he had been intimidated by the victim because the victim was ten years older, and taller and heavier than the defendant, in addition to being known to be aggressive ("a bully"). The defendant contends, therefore, that Nields's testimony created a substantial likelihood of a miscarriage of

---

[18] Defense counsel also did not object when the prosecutor relied heavily upon the information from the autopsy report in his closing. See part 2.d, infra.

justice because it undermined the defense argument that the defendant was smaller than the victim.[19]

We need not address the extent to which a substitute medical examiner who did not perform the autopsy may testify to the facts contained in the underlying autopsy report. Even if this evidence were improperly admitted, where it is cumulative of other, properly admitted evidence, there is no substantial likelihood of a miscarriage of justice. See Commonwealth v. Reavis, 465 Mass. 875, 884 (2013); Commonwealth v. Rogers, 459 Mass. 249, 268, cert. denied, 565 U.S. 1080 (2011). Here, other properly admitted evidence about the victim's height and weight placed essentially the same information before the jury. That evidence included testimony by Dr. Richard T. Miller, a surgeon who was called to the emergency room to perform an emergency thoracotomy on the victim;[20] one of the witnesses to the

---

[19] There was testimony that the defendant was six feet tall and weighed two hundred pounds, but there also was testimony that the defendant was smaller and thinner than the victim, maybe five feet, eight inches tall.

[20] Miller testified,

"I -- difficult to say. He was being resuscitated on a trauma stretcher on a gurney in the emergency room. I would say he -- my impression was he was an average-sized individual, under six feet tall, somewhere between one hundred and sixty and one hundred and eighty pounds. That's my best recollection."

The prosecutor then asked Miller if he had been able to "refresh [his] memory" by reviewing the autopsy report. When Miller

stabbing who testified that he believed the defendant and the victim were "[a]bout the same height;" and a friend of the victim who testified that the victim was shorter and wider than his own six feet and one hundred and ninety-five pounds.

The defendant also challenges the introduction of information from the autopsy report describing the victim's wounds and stating that the wounds were three to four inches deep, information which was not evident from the autopsy photographs that Nields properly had relied upon earlier in his testimony. The information about the wounds was introduced by the prosecutor's unobjected-to specific questions as to the contents of the autopsy report.

Generally, where a defendant relies on erroneously admitted facts contained in an autopsy report to challenge the Commonwealth's theory of guilt, there is no substantial likelihood of a miscarriage of justice by the prosecutor's reliance on facts from the same report. See Commonwealth v. McGowen, 458 Mass. 461, 481-482 (2010). See also Commonwealth v. Nardi, 452 Mass. 379, 395-396 (2009). Such is the case here.

In his closing, defense counsel relied upon the challenged

---

responded that he had, the prosecutor asked if the contents of the report were consistent with Miller's memory and Miller responded that they were, thus again introducing, albeit cumulative of other assumedly improper testimony, the contents of the autopsy report.

testimony regarding the depth of the wounds. He argued that the nature of the wounds, and their depth, showed that the defendant inflicted the fatal wounds to the heart while he swung wildly in self-defense, trying to push the victim off and that the victim died instantly. Counsel focused as well on the injury to the victim's mouth, likely inflicted by a fist (termed "the busted lip" by the prosecutor), which counsel argued showed that the confrontation had begun with a fist fight.

Moreover, Miller, the emergency room surgeon, testified that, ordinarily, a human heart lies between four and six inches below the surface of the chest, and that the victim's heart had been penetrated. One of the witnesses who saw the encounter also testified that at first he saw someone wearing a "hoodie" punching with nothing in his hand, and later saw the man holding what looked like a "blade, four or five inches long." This would have allowed the jury to infer, from properly admitted evidence, that the blade of the knife went four inches into the victim's body.[21] See Rogers, 459 Mass. at 268.

d. Prosecutor's closing argument. The defendant contends that there were multiple improprieties in the prosecutor's

---

[21] Defense counsel himself interrupted the prosecutor at one point to emphasize that, based on the autopsy report, the "three to four" inch depth of the wound was from the surface of the skin to the heart, not the depth of the cut in the heart itself.

closing argument, some reprising errors that contributed to the remand for a new trial in Niemic I. In particular, the defendant points to the prosecutor's reliance on Wright's rebuttal testimony as though it were substantive evidence, and the reappearance, albeit in a more nuanced form, of the appeals to jury sympathy and suggestions that the defendant's testimony was not actual evidence,[22] both of which we deemed impermissible in reviewing the prosecutor's closing in Niemic I.

At his second trial, the defendant objected to the first two issues. When the prosecutor finished his closing on retrial, defense counsel argued that no instruction could ameliorate the damage caused by the substantive use of the rebuttal testimony and the improper play to juror sympathy, and that a mistrial should be declared.

We consider first whether the arguments were improper, and, if so, whether, in the context of the trial as a whole, the impropriety or combination of improprieties requires a new trial. Given all the circumstances, we conclude that the

---

[22] Notwithstanding that our remand in Commonwealth v. Niemic, 472 Mass. 665 (2015) (Niemic I), was based in part on the prosecutor's unobjected-to suggestions in closing that the defendant's testimony was not evidence, at the second trial defense counsel again did not object when the prosecutor made a number of statements that were virtually identical to those sharply criticized at the first trial. Given the result we reach on the other issues, we need not address the extent to which these statements alone may have resulted in a substantial likelihood of a miscarriage of justice.

improprieties in the prosecutor's closing alone warrant a new trial. That conclusion is further reinforced when other errors that emerged during our review under G. L. c. 278, § 33E, are considered in conjunction with the challenged errors.

i. Substantive use of rebuttal testimony. At four points in his closing, the prosecutor referenced Wright's testimony concerning Nason's statement that the defendant was going to "sucker punch" the victim when he left the SUV. Three of these were used substantively, and one was used properly for impeachment purposes.[23] Three times, woven throughout his closing, the prosecutor relied on the statement to argue that the defendant clearly intended to assault the victim, not to talk to him and resolve any issues, when the defendant approached.[24]

The prosecutor maintained further, as the judge commented,

---

[23] The prosecutor's fourth reference to Wright's rebuttal testimony, made in the context of his vigorous efforts to discredit several witnesses who testified that the victim threw the first punch, was properly used for impeachment purposes. The prosecutor argued that Nason and the defendant had testified that the victim "land[ed] a punch on the defendant," and contrasted that with Wright's testimony that Nason told her the defendant was going to "sucker punch" the victim; the prosecutor asked, "Is she making that up? Is she not credible? What does that say to you about who is the aggressor?"

[24] On appeal, the Commonwealth concedes that the substantive use of Wright's testimony in the prosecutor's closing was error, but states that this error did not result in a substantial likelihood of a miscarriage of justice.

"very effectively," that the defendant had gone to the soup kitchen with a "purposeful plan" to attack the victim, and that his own words proved the confrontation was planned, rather than an unexpected fight in which the defendant stabbed in self-defense. Indeed, the prosecutor's use at closing of the statement as substantive evidence was so emphatic that, after the prosecutor's closing, the judge noted sua sponte that the statement went to the "seminal" issue at trial (the defendant's intent when he went over to the victim), that she thought Wright's testimony had been introduced only for rebuttal purposes, and that she was going to give a limiting instruction to that effect. Immediately before her final charge, the judge instructed the jury accordingly.[25]

Improper argument by a prosecutor can be harmless error where confined to collateral issues and accompanied by a

---

[25] The judge instructed:

"Ms. Wright was called this morning in rebuttal, and she testified about a statement that she alleged Mr. Nason made to her about -- that he, Mr. Nason, told her that the defendant was going to sucker [the victim]. The only reason that that testimony was admitted, and we'll talk about this a little bit later on, was to impeach Mr. Nason's testimony. That's the only reason it was allowed in, and I'll talk to you about impeachment. You may not consider that evidence from Ms. Wright this morning for any other purpose than impeaching Mr. Nason's testimony. You may not specifically consider it or attribute it in any way to the defendant and his state of mind."

curative instruction. Commonwealth v. Shelley, 374 Mass. 466, 470 (1978), S.C., 381 Mass. 340 (1980), and 411 Mass. 692 (1992). The prosecutor's repeated use of what had been admitted for a limited purpose as substantive evidence here, however, undermined the heart of the defense, "namely, the defendant's credibility as to who was the initial aggressor, who produced the knife, and whether the defendant acted in self-defense."[26] Niemic I, 472 Mass. at 677. The improper references to the testimony as substantive evidence during closing argument could not but have had an effect upon the jury. See part 2.v, infra. Contrast Commonwealth v. Giguere, 420 Mass. 226, 234-235 (1995).

ii. Appeals to juror sympathy and emotion. The defendant argues that in his closing the prosecutor improperly appealed to the jury's sympathies, thus replicating an error in Niemic I that contributed to the need for a new trial. See Niemic I, 472 Mass. at 675. The Commonwealth concedes that, rather than steering a wide berth around this error on retrial, the prosecutor relied on virtually the same language on a number of occasions. Notwithstanding this court's decision in Niemic I, supra, the Commonwealth argues that the language was not an

---

[26] We are cognizant that here, as with other testimony that had been excluded or was inadmissible, it was defense counsel's own questions that resulted in the introduction of the previously excluded statement, with apparently significant harmful effect on his client.

improper appeal to sympathy, but, rather, was "entirely appropriate."  Alternatively, the Commonwealth maintains that, in "context," no reasonable juror would have drawn the inference from the challenged statements that the prosecutor was appealing to sympathy or saying that the defendant's testimony was inherently incredible.  The Commonwealth also suggests that the asserted improprieties were relatively minor in scope in comparison to the percentage of the closing that they encompassed in Niemic I; in the Commonwealth's view, "only four" remarks by the prosecutor are at issue.  While certain specific statements were not reiterated in the prosecutor's second closing,[27] the emphasis on the impermissible arguments was not any less "hard driving and sustained" on "critical aspect[s] of the case."[28]  Id. at 677.  The impact of the closing on the jury

_____

[27] Many of the detailed statements about the efforts to render aid to the victim, by attendees at the meeting, by the EMTs, and at the hospital, that this court had criticized in Niemic I, were instead made in the prosecutor's opening statement at the retrial, and mentioned more briefly in his closing argument.

[28] As he had in Niemic I, "[t]oward the end of his argument the prosecutor focused on the Cunneen factors that must be considered on the question of extreme atrocity or cruelty." Niemic I, 472 Mass. at 675.  "This part of the prosecutor's closing was very powerful, and proper.  The prosecutor should have stopped there."  Id.  Thereafter, "[t]he improper comments at the end of the closing comprised a structural segment, indeed, the denouement of the prosecutor's closing.  This section of his argument was integrated into his argument of the Cunneen factors, particularly the defendant's indifference to the victim's suffering."  Id. at 676.

should be judged not by the number of transcript pages it occupies, but by the import of its use.[29]  Moreover, in many instances the language used was perilously close to that which had been found inappropriate in Niemic I.

At the defendant's second trial, the prosecutor began and ended his closing with the same attempt to tug at the jury's heart strings.  Indeed, he framed his argument with equally improper plays to juror sympathy in virtually the same language that he had used at the first trial, including the victim's last words to his father -- "Dad, don't let me die, don't let me die," with which the prosecutor once again ended his closing -- which had been a focus of the court's discussion of the

---

[29] In any event, the numbers favor the defendant.  The prosecutor's sympathy argument in total was longer at the second trial than at the first.  In Niemic I, the prosecutor's closing argument in full required thirty-one pages of transcript; of these, approximately the last six pages were devoted to the improper argument.  At the second trial, the prosecutor's closing argument covered approximately thirty-nine pages of trial transcript, approximately twenty-one percent longer than at the first trial.  While much of the last ten pages of the second closing was devoted to improper argument, the improper argument began in the first paragraph of the first page, and was woven throughout.  Furthermore, the prosecutor's opening statement at the new trial also began with reference to the same inflammatory statement by the victim that had been a focus of the improprieties in the closing at the Niemic I trial. Finally, three pages of the prosecutor's opening statement contained the reported efforts of meeting attendees, EMTs, and emergency room personnel to save the victim for which the prosecutor had been admonished in Niemic I.  See note 27, supra.

improprieties in Niemic I, 472 Mass. at 675-676.  The prosecutor then proceeded in the same vein as at the first trial, frequently using much the same language.  Structuring his argument with the jury's focus on the victim's words, he ended with the same pleading statement by the victim.  For example,

| First Trial | Second Trial |
| --- | --- |
| "And they saw him struggling and bleeding in front of his own father."  See Niemic I, 472 Mass. at 675. | "Ladies and gentlemen, on October 20, 2010, there was a brutal, senseless murder in the city of New Bedford.  The brutality you've already heard about. A young man unarmed, set upon by the defendant, hands up, defenseless, stabbed multiple times over and over.  Ends up bleeding out, dying, begging for his life in front of his father" (emphasis added). |
| | "What does that say about what he intended?  Some punching, then the knife comes out. Stabbing.  And then he is finishing the job right up to the point where he chases him down, stabs him in the side and in the back, and then leaves him to die, bleeding out, right at the -- in front of all these people, including his own father who -- give whatever consideration you want to the stipulation.  It's hard to imagine how or what a father might say or understand in the course of watching his son bleed out in front of him, saying, 'Dad, don't let me die.  Don't let me die.'"  (Emphases added.) |
| | "begging for his life" |

This is all the more surprising in that, shortly before

closing arguments, the parties informed the judge that they had entered into a stipulation concerning a statement by the victim's father about the victim's last words to him, a focus of our discussion in Niemic I.[30]  Defense counsel read the stipulation to the jury immediately prior to the closings. Rather than referencing the language in the agreed-upon stipulation, the prosecutor instead chose to attack the very idea of the stipulation to which he had agreed, arguing, as noted, "give whatever consideration you want to the stipulation. It's hard to imagine how or what a father might say or understand in the course of watching his son bleed out in front of him . . . ."

As before, the prosecutor pointed out all the other people who happened to be present "at the wrong spot at the wrong time."  He also said that they had seen the victim "bleeding out," "begging for his life" "in front of all these people, including his own father," "at the start," "at the middle," "and, unfortunately, the bitter end."  Foreshadowed by the prosecutor's opening,[31] this language mirrored the prosecutor's

---

[30] The stipulation was that the father stated, "My son comes running in.  He said, 'Dad, I was just fighting with a guy.'"

[31] The prosecutor's opening statement detailed the efforts of bystanders, EMTs, and emergency room doctors to save the victim, another "highly improper, emotionally charged discussion" that had featured in the court's admonition in Niemic I.  Id. at 675.

improper statements in <u>Niemic I</u>, 472 Mass. at 675, that the "civilian witnesses" were "at the wrong time at the wrong place." As the court emphasized in <u>Niemic I</u>, "[t]he emotional impact on witnesses of the victim's death was not a proper matter for consideration by the jury." <u>Id</u>.

Notwithstanding this court's prior admonitions, after defense counsel objected at the end of the closing, the prosecutor told the judge:

> "The one thing I would say, Your Honor, just about dying in front of his father. One, begging for his life, that's in evidence; two, in front of his father, that was in evidence; and three, I do believe, and I think I maybe said this to you or I've said it, dying in front of your father to me is more conscious suffering than dying out in the woods alone. I mean, I would feel worse if I'm dying in front of my father. And so it goes to the issue of conscious suffering of the victim."

Pointing, however, to this court's comments about playing to juror sympathy and emotion in <u>Niemic I</u>, the judge, just prior to her final charge, instructed the jury that sympathy, and specifically sympathy for the father, should play no role in the jury's deliberations.[32]

---

[32] The judge instructed:

"[T]o the extent that in the closing argument [the prosecutor] talked about [the victim] begging for his life in front of his father and that the defendant left him to die in front of his father, you may not decide this case in any way, shape or form based upon sympathy. It's not to take any place in your deliberations. And if you interpret -- if you interpret that argument by [the

In <u>Niemic I</u>, 472 Mass. at 675, we concluded that the
prosecutor's "highly improper, emotionally charged discussion
covering three pages of transcript" that attempted to inflame
the jury's emotions was a significant factor in the need for a
new trial.  Prosecutorial "appeals to sympathy . . . obscure the
clarity with which the jury would look at the evidence and
encourage the jury to find guilt even if the evidence does not
reach the level of proof beyond a reasonable doubt."
<u>Commonwealth</u> v. <u>Bois</u>, 476 Mass. 15, 34 (2016), quoting
<u>Commonwealth</u> v. <u>Santiago</u>, 425 Mass. 491, 501 (1997), <u>S</u>.<u>C</u>., 427
Mass. 298 and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998).

In addition to the defendant's claims concerning the
prosecutor's closing argument, our review under G. L. c. 278,
§ 33E,[33] reveals two other types of improprieties, namely that

----

prosecutor] that he's -- as appealing to your sympathy, you
are to disregard because that's not a proper purpose.  It
may be considered on other issues, but appealing to
sympathy is not a proper purpose."

See part 2.v, <u>infra</u>.

[33] "General Laws c. 278, § 33E, directs us to review the
case of a defendant convicted of murder in the first degree by
considering the 'whole case,' and not merely questions that have
been properly preserved for appellate review." <u>Commonwealth</u> v.
<u>Colleran</u>, 452 Mass. 417, 430-431 (2008), quoting <u>Commonwealth</u> v.
<u>Hall</u>, 369 Mass. 715, 736 (1976).  "The statute states:  'Upon
such consideration the court may, if satisfied that the verdict
was against the law or the weight of the evidence, or because of
newly discovered evidence, or for any other reason that justice
may require (a) order a new trial or (b) direct the entry of a

the prosecutor used facts not in evidence or misstated facts and improperly stated his own opinion on multiple occasions. We discuss each in turn.

iii. <u>Facts not in evidence and misstatements of fact</u>. On more than ten occasions, the prosecutor argued facts not in evidence, often on issues central to the case, or asked the jury to draw inferences the evidence did not support. We focus on only a few of the more significant misstatements: (A) that the defendant had said a few months previously that he planned to slice up the victim at an AA meeting; (B) that the defendant had attempted deliberately to provoke the victim by overt romantic gestures with Weaver in front of the victim; and (C) that the victim had gone to the meeting that night to avoid the defendant.

A. <u>"Slice" up the victim</u>. In one particularly glaring misstatement, the prosecutor argued that, several months before the stabbing, the defendant had told the victim he planned to "slice [the victim] up when [he saw him] at an AA meeting." There was no testimony that the defendant made such a statement. To the contrary, Nason testified that, a few months before the stabbing, the <u>victim</u> had said he would "slice" the defendant when they next met. The defendant testified similarly. Even if

---

verdict of a lesser degree of guilt . . .'" (emphasis omitted). <u>Colleran</u>, <u>supra</u> at 431, quoting G. L. c. 278, § 33E.

meant sarcastically, the prosecutor was not free to attribute this testimony to the defendant. See Commonwealth v. Young, 461 Mass. 198, 206 (2012).

B. The kiss. To emphasize the defendant's premeditation, and the inference that the defendant's interaction with Weaver was designed to upset or annoy the victim, the prosecutor argued repeatedly that the defendant had intentionally hugged and kissed Weaver multiple times, in order to provoke him. "[The defendant] takes a position with [Weaver], and that's when all the hugging and the kissing, like right in front of [the victim]. Does that sound like he's trying to get a reaction: This is my girl. There was a lot of hugging and kissing that was described." The prosecutor sprinkled multiple references to "the business with the hugging and kissing," and the defendant's act of "kiss hug, kiss hug" throughout his closing.

Whether the physical intimacy between Weaver and the defendant was limited to a brief peck on the cheek or included some hugs and kisses, see note 3, supra, there was no evidence that the defendant had planned or engaged in such interaction with Weaver to provoke the victim. There was no evidence that the victim was even watching the two, whose interaction was at an approximate distance of thirty feet from the victim. The evidence was that the victim spent that time standing with his former roommate looking at his cellular telephone, learning how

to download music.  If anything, the evidence suggested that Weaver's conduct -- reaching out, grabbing the defendant by the arm, and pulling him back toward her, saying, "no, don't" -- was meant to detain the defendant and discourage him from approaching the victim.  While a prosecutor may argue reasonable inferences to be drawn from the evidence, a prosecutor may not argue facts not in evidence or misstate the evidence.  See Young, 461 Mass. at 206.

C.  Hiding from the defendant.  To further his theme that the defendant had gone to the soup kitchen with a "purposeful plan" to confront the victim, rather than to drop off Weaver, the prosecutor argued that the victim ("a deer in the headlights") had gone to the AA meeting specifically to avoid the defendant, and the defendant, in turn, had "gone to where [the victim] is when he has tried -- you know, when [the victim] doesn't want to deal with [the defendant]."  There was absolutely no evidence to support this misrepresentation that the victim was at the meeting at the soup kitchen seeking refuge from the defendant.

Such "[r]eferences to facts not in the record or misstatements of the evidence have been treated as serious errors where the misstatement may have prejudiced the defendant."  Santiago, 425 Mass. at 499-500.  See Shelley, 374 Mass. at 469 (where prosecutor introduced facts not in evidence,

"we have recognized that the failure to object and possibly obtain a curative instruction may be the very thing which permits the remarks to have their maximum prejudicial effect").

iv. <u>Statements of prosecutor's opinion</u>. At numerous points in his closing, as he had impermissibly in <u>Niemic I</u>, 472 Mass. at 674-675, 677, the prosecutor explicitly told the jury his own opinion of the defendant's credibility, as well as that of some of the other witnesses. See <u>Commonwealth</u> v. <u>Sanders</u>, 451 Mass. 290, 296-297 (2008), citing <u>Commonwealth</u> v. <u>Wilson</u>, 427 Mass. 336, 352 (1998), and <u>Commonwealth</u> v. <u>Chavis</u>, 415 Mass. 703, 713 (1993) (prosecutor may not express his or her personal belief in testimony or suggest that he or she has knowledge outside record, and may not suggest prosecutor has personal knowledge of, or vouch for, credibility of any witness). See also <u>United States</u> v. <u>Torres-Galindo</u>, 206 F.3d 136, 142 (1st Cir. 2000) (vouching includes statements that "invite the jury to rely on the prestige of the government and its agents rather than the jury's own evaluation of the evidence").

A prosecutor's statement of personal belief is improper. See <u>Commonwealth</u> v. <u>Thomas</u>, 401 Mass. 109, 115 (1987). "To permit counsel to express his personal belief in the testimony (even if not phrased so as to suggest knowledge of additional evidence not known to the jury), would afford him a privilege not even accorded to witnesses under oath and subject to cross-

examination.  Worse, it creates the false issue of the reliability and credibility of counsel.  This is peculiarly unfortunate if one of them has the advantage of official backing."  Id. at 115-116, quoting Commonwealth v. De Christoforo, 360 Mass. 531, 547 (1971) (Tauro, J., dissenting).

Here, the prosecutor repeatedly stated his own opinion that Nason "lie[d]"[34] in much of his testimony, and, later told the jury Nason had "lied to you folks."[35]  The prosecutor also repeatedly emphasized that the defendant was "lying,"[36] as were the other defense witnesses.[37]  The prosecutor also identified, as he had impermissibly at the first trial, see Niemic I, 472

---

[34] For example, "So only the words out of his mouth about the kind of bad guy [the victim] is to make you think less of him.  That's not the evidence.  You heard the evidence in this case.  He had a motive.  He had a motive because he was angry about the girlfriend."

[35] For example, "The wheel man who lied to you folks when he said [he] didn't know what [the defendant] was going to do as he's going to over to talk to [the victim].  Remember?"

[36] For example, "[The defendant] lied to us about, "Oh, no. I didn't know I stabbed him."  He's telling them as he jumped in the car, "I stabbed him."  He knew he stabbed him.  Not swinging aimlessly.  He knew he stabbed him."

[37] The prosecutor argued multiple times in a similar vein that the defendant's testimony was contrary to "the evidence." At one point, the prosecutor argued that the defendant will "keep saying what he wants to say.  Get his story out there, hoping that there will be a narrative that somebody will buy. That's inconsistent with the evidence" (emphasis added).

Mass. at 671, 673, 675, 676, that testimony which had been given by "civilians" (who were not friends of the defendant) and therefore was the sole credible evidence.

The prosecutor of course was entitled to use "enthusiastic rhetoric, strong advocacy, and excusable hyperbole" (citation omitted).  Wilson, 427 Mass. at 350.  These statements, however, crossed the line between fair and improper argument.  "This line of argument . . . further suggested to the jury that the testimony of these . . . prosecution witnesses had to be believed in toto and that any testimony of the defendant which diverged had to be discredited as a lie."  Thomas, 401 Mass. at 116.  A prosecutor "may not explicitly or implicitly vouch to the jury that he [or she] . . . knows that the witness's testimony is true."  Commonwealth v. Marrero, 436 Mass. 488, 501 (2002), quoting Commonwealth v. Ciampa, 406 Mass. 257, 265 (1989).

Given the absence of objection by defense counsel,[38] the

_____

[38] We are not unaware of apparent deficiencies in defense counsel's performance, as already remarked upon here and in parts 2.c and 2.d.i, ii, iii, and iv, supra.  See, for example, notes 18, 21, 22, 26, and 27, supra.  Also, counsel's efforts to introduce evidence favorable to the defendant often served as the bulwark of much of the evidence that was contrary to the theory of defense.  See note 26, supra.  In addition, counsel failed to object to the prosecutor's more than "hard driving" cross-examinations; failed to ask for a contemporaneous (or any) limiting instruction; and failed to object to the prosecutor's persistent interruptions of defense counsel's questions on

only relevant instruction provided was the general instruction that the attorneys' closing arguments are not evidence, and that if the jury's memory of the evidence differed, they were to rely on their collective memory.  This general instruction was not sufficient to explain to the jury why they should not rely on the prosecutor's assertions of his own beliefs.  Marrero, 436 Mass. at 502.  See Torres-Galindo, 206 F.3d at 142.  See, e.g., Commonwealth v. Williams, 450 Mass. 894, 906 (2008) ("In cases where a prosecutor improperly has given unsworn testimony that went to a critical issue in the case, or improperly has vouched for a key Commonwealth witness, where there has been an objection [and sometimes not], and where the case against the defendant is not otherwise overwhelming [as here], we have required a judge to respond to prosecutorial misconduct with force and specificity.  A general instruction, as here, will not suffice to neutralize the prejudice").  See also Commonwealth v. Worcester, 44 Mass. App. Ct. 258, 266-267 (1998) (new trial required based on prosecutor's improper comments on defendant's credibility).

v.  Whether a new trial is warranted.  Given our conclusion that portions of the prosecutor's closing were improper, we turn

direct and cross-examination of many witnesses.  Because of the result we reach, we need not address these issues further.

to consideration whether one or more of these improprieties, or a combination of all, warrant a new trial. In determining whether a new trial is required because of errors at trial, we consider "whether 'defense counsel seasonably objected to the arguments at trial . . . whether the judge's instructions mitigated the error . . . whether the errors in the arguments went to the heart of the issues at trial or concerned collateral matters . . . whether the jury would be able to sort out the excessive claims made by the prosecutor . . . and whether the Commonwealth's case was so overwhelming that the errors did not prejudice the defendant.'" Commonwealth v. Maynard, 436 Mass. 558, 570 (2002), quoting Santiago, 425 Mass. at 500.

"[T]he cumulative effect of all the errors must be 'considered in the context of the arguments and the case as a whole.'" Niemic I, 472 Mass. at 673, quoting Maynard, 436 Mass. at 570. "Once a properly raised objection to a prosecutor's argument is found to be valid, the entire record, including the balance of the prosecutor's argument, becomes relevant in determining whether the error was prejudicial to the point of requiring a reversal of the conviction." Commonwealth v. Kozec, 399 Mass. 514, 523 (1987), citing Commonwealth v. Burke, 373 Mass. 569, 577 (1977).

Here, even if no one impropriety alone would mandate a new trial, we conclude that the confluence of the asserted errors in

closing, one of which reiterated the essence of the errors that contributed primarily to the need for the second trial, do again necessitate a new trial. Counsel "seasonably objected" to two of the arguments -- the substantive use of rebuttal testimony and the play to jury sympathy -- and not to the others, which we uncovered in our review pursuant to G. L. c. 278, § 33E, but the absence of an objection makes no difference in our conclusion. Even when reviewed under a substantial likelihood of a miscarriage of justice standard,[39] the improprieties require a new trial, because we cannot be certain that the jury would have been able to look at the evidence clearly and reach a decision based only on proof beyond a reasonable doubt. See Bois, 476 Mass. at 34, quoting Santiago, 425 Mass. at 501.

As to the second Maynard factor, while there was no contemporaneous limiting instruction, the judge gave appropriate curative instructions with respect to the two preserved errors immediately before her final charge. See Maynard, 436 Mass. at 570; notes 25 and 32, supra. In her final charge, given shortly thereafter, the judge provided general instructions that

---

[39] Under G. L. c. 278, § 33E, we review for a substantial likelihood of a miscarriage of justice, under which a defendant is entitled to relief only "if we have a serious doubt whether the result of the trial might have been different had the error[s] not been made." Commonwealth v. Russell, 439 Mass. 340, 345 (2003), quoting Commonwealth v. LeFave, 430 Mass. 169, 174 (1999).

attorneys' arguments are not evidence, and that the jurors should not make a decision based on sympathy or pity.  The judge did as much as she could to mitigate the improprieties, which, in other circumstances, might be enough.  See Giguere, 420 Mass. at 235.

We have long recognized, however, that not all errors can be cured by providing proper instructions.  See Commonwealth v. Redmond, 370 Mass. 591, 597 (1976) (no one error "was necessarily so prejudicial that curative instructions were useless or that the instructions given were inadequate"; nonetheless, curative instructions were inadequate in circumstances to overcome combination of errors); Commonwealth v. DiMarzo, 364 Mass. 669, 681 (1974) ("It is reasonable for us to be confident that in most cases limiting instructions accomplish their intended purpose.  Nevertheless, in cases like the instant one, where the evidence subject to limitations has an extremely high potential for unfair prejudice, we have a duty to be skeptical as to the effectiveness of limiting instructions"); id., quoting Nash v. United States, 54 F.2d 1006, 1007 (2d Cir.), cert. denied, 285 U.S. 556 (1932) (in some contexts, curative instructions "have been characterized by Judge Learned Hand as 'the recommendation to the jury of a mental gymnastic which is beyond, not only their power, but anybody's else'").  See also Commonwealth v. James, 424 Mass.

770, 782 (1997), quoting Richardson v. Marsh, 481 U.S. 200, 208 (1987) (curative instruction not sufficient to cure prejudice in "cases where the codefendant's statement 'expressly implicate[s]' the defendant, leaving no doubt that it would prove to be 'powerfully incriminating'"). In the circumstances here, given the confluence of errors, the inherently highly emotional testimony, and the context of the trial, we cannot say with confidence that the repeated references to the rebuttal testimony and the appeals to sympathy and emotion did not infect the jury.

Turning to the remaining Maynard factors, the improprieties went to "the heart of the issues at trial," and were not collateral. See Niemic I, 472 Mass. at 676-677. The Commonwealth's case at the defendant's first trial was "not overwhelming," id. at 677, and in some respects it was weaker at the second trial, due to the unavailability of the medical examiner who had performed the autopsy and changes in testimony or lapses in memory by a number of witnesses. The improper undermining of the theory of defense in effect instructed the jury that they reasonably could not believe the defendant's testimony.

At the same time, the improper statements in the prosecutor's closing were designed to inflame the jury's passions, such that they would feel the need to avenge the

victim, in a trial where a significant portion of the evidence, concerning the efforts to save the victim after he lost consciousness, was designed to be emotionally disturbing, in order to support the charge of extreme atrocity or cruelty. Yet, the statements were not so clearly hyperbole that the jury would have been able to identify and sort out "the excessive claims made by the prosecutor," and his exhortations that the jury could not believe the defendant or any of the "non-civilian" testimony. Maynard, 436 Mass. at 570, quoting Santiago, 425 Mass. at 500.

"[T]he prosecutor, in his opening and closing statements . . . improperly appealed to the jury's sympathy for the victim in a way that may have 'swe[pt] the jurors beyond a fair and calm consideration of the evidence." Santiago, 425 Mass. at 493-494, quoting Commonwealth v. Perry, 254 Mass. 520, 531 (1926). The prosecutor's "comments went to the very heart of the case. They struck, and struck impermissibly, at the defendant's sole defense, and sought to impeach his only witnesses." Shelley, 374 Mass. at 471. "[I]mproper suggestions, insinuations, and, especially, assertions of personal knowledge [by the prosecutor] are apt to carry much weight against the accused when they should properly carry none." Id. at 472, quoting Berger v. United States, 295 U.S. 78, 88 (1935). It was thus unlikely that the jurors would have

been able to "sort out the excessive claims made by the prosecutor" and decide the case on the evidence (citation omitted). See Niemic I, 472 Mass. at 673-674.

Given all this, the improprieties in argument, especially the appeals to sympathy, were rendered particularly crucial. "[T]hat is the nature of appeals to sympathy:  they do not misstate any piece of evidence, but rather obscure the clarity with which the jury would look at the evidence and encourage the jury to find guilt even if the evidence does not reach the level of proof beyond a reasonable doubt.  Thus, the strength of the Commonwealth's case is particularly crucial where improper appeals to sympathy are made.  Where guilt is clear, we may conclude that the overwhelming strength of the evidence led the jury to its conclusion, but where the questions are close and difficult, we cannot be certain that the jury's conclusion was not clouded by the improper appeals and that their verdict was based on a dispassionate view of the evidence." Santiago, 425 Mass. at 501-502.  Here, the evidence was not overwhelming, and the appeals to sympathy are accordingly worrisome.

We turn to the effect of the improprieties as a whole.  As discussed, two of the improprieties in the prosecutor's closing are preserved, and are reviewable under a prejudicial error standard.  With respect to those uncovered during § 33E review, we review for a substantial likelihood of a miscarriage of

justice, under which a defendant is entitled to relief only "if we have a serious doubt whether the result of the trial might have been different had the error[s] not been made." Commonwealth v. Russell, 439 Mass. 340, 345 (2003), quoting Commonwealth v. LeFave, 430 Mass. 169, 174 (1999).

In the context of this case, the use of the rebuttal testimony as substantive evidence, and the improper appeals to sympathy and emotion were prejudicial to the defendant. Because the statements at issue addressed his intent in approaching the victim -- a core issue at trial underpinning his conviction for premeditated murder -- and called upon the jury to rely on sympathy and emotion, the wrongful use of such evidence constituted prejudicial error. That is so because, in this context, the prosecutor's improper statements on seminal issues would have been too intertwined with what the prosecutor himself described as his "strenuous[]" and "contentious" trial strategies for the jury to have engaged in "fair and calm" consideration of the evidence (citation omitted). See Santiago, 425 Mass. at 494. We have serious doubt, particularly when these errors are reviewed in combination with those revealed in our review under G. L. c. 278, § 33E, "whether the result of the trial might have been different had the error[s] not been made." Russell, 439 Mass. at 345, quoting LeFave, 430 Mass. at 174. Accordingly, a new trial is necessary.

3.  Conclusion.  "We take no pleasure, in fact we harbor a degree of concern, that a time-consuming and costly retrial must be held. . . .  Our task, not always an easy one, is to preserve the interests of justice, both for the Commonwealth and the accused.  On this record, the risk of a miscarriage of justice is too great for us to let stand the defendant's conviction of murder . . . ."  Kater, 388 Mass. at 534.

The verdict of guilty of murder in the first degree is vacated and set aside.  The matter is remanded to the Superior Court, where the Commonwealth again may accept a reduction in the verdict to manslaughter, or once again may retry the defendant on the murder charge.

So ordered.